ROBERT B. MORTON, Plaintiff-Appellant, v. NEIL F. HARTIGAN, Attorney General, *et al.*, Defendants-Appellees.

First District (1st Division)   No. 85—1846

Opinion filed June 23, 1986.

418

Robert B. Morton, of Chicago, for appellant, *pro se.*

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Michael J. Hayes, Jeffrey W. Finke, and Roger P. Flahaven, Assistant Attorneys General, of Chicago, of counsel), for appellees.

JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff, Robert B. Morton, a former special assistant Attorney General, brought an action against the Attorney General of Illinois, and three other officials at the Attorney General's office in their individual capacities, seeking compensatory and punitive damages for the torts of retaliatory discharge, defamation and invasion of privacy. The circuit court entered an order dismissing certain counts of the complaint with respect to certain defendants. Subsequently, the defendants filed a motion for judgment on the pleadings with respect to the remaining counts, pursuant to section 2—615(e) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—615(e)). The motion was granted and plaintiff now appeals. For the reasons set forth below, we affirm.

On April 11, 1983, the plaintiff, a recent admittee to the Illinois Bar, was assigned full time to the Welfare Litigation Division of the Illinois Attorney General's office. His immediate supervisor was James O'Connell, chief of that division. In January 1984, the plaintiff was informed that his employment as a special assistant Attorney General would be terminated at the end of that month because of his unprofessional conduct on the job.

Thereafter, the plaintiff filed a three-count complaint against Neil F. Hartigan, the Attorney General of Illinois; Charles Murdock, the deputy Attorney General; Paul Biebel, Jr., the first assistant Attorney General; and James O'Connell, the chief of the Welfare Litigation Division of the Attorney General's office. Count I of the complaint was premised on a retaliatory-discharge theory and was directed against all four defendants. While plaintiff conceded in exhibits attached to his complaint that he had an argument with a female associate, directed "indiscreet" comments towards his supervisor, and experienced an "unseemly loss of temper" on the job, he nevertheless maintained in count I of his complaint that he was discharged in retaliation for his activities during his tenure at the Attorney General's office.

The first of these activities set forth in count I involved the settlement of a lawsuit filed by his office: People *ex rel.* Treasurer of Illinois v. First National Bank of Chicago, No. 81 L 5153, circuit court of Cook County. In that case, the defendant banks were charged with wrongfully negotiating State public-aid warrants on which payee signature endorsements had been forged. Plaintiff was assigned to the matter along with two other assistant Attorneys General. At the order of defendant O'Connell, the case was settled for $77,000, approximately $4,300 more than the face value of the warrants. Plaintiff alleged that the settlement was improperly reached and deprived the State of an additional recovery of more than $100,000. As a result, plaintiff prepared a motion and memorandum to set aside the settlement, and gave it to Hartigan.

The second activity described in count I centered around an unsolicited memorandum entitled "Proposed Legislative and Judicial Initiatives" prepared by the plaintiff and submitted to defendant Hartigan. The memorandum urged the Attorney General to make various legislative changes as well as channel the office's litigation manpower and resources into certain areas designated by the plaintiff. The memorandum also proposed remedial measures to be enforced within the Attorney General's office.

The third incident alleged by plaintiff in count I pertained to defendant O'Connell's withdrawal of his own contributions from the State's pension fund. The complaint alleged that O'Connell, in withdrawing his contributions, violated the regulations of the State Employees' Retirement System. Plaintiff claimed he was fired in part because he told O'Connell that the withdrawal of his pension contributions was unlawful and threatened to report him.

Count II of the complaint sought recovery for defamation and was also directed against all four defendants. First, plaintiff alleged in count II that defendant Murdock wrote a letter to plaintiff in which he characterized plaintiff's conduct as "highly unprofessional." Second, plaintiff alleged that defendant Hartigan also referred to plaintiff's conduct as "unprofessional" in a telephone conversation he had with Judge (then attorney) Edward Burr, who called Hartigan on plaintiff's behalf. Plaintiff further alleged that all four defendants defamed him by speaking to one another about his conduct on the job and attributing certain derogatory remarks to him.

Count III was directed only against defendant O'Connell and alleged invasion of plaintiff's right to privacy and seclusion. Specifically, count III alleged that O'Connell searched plaintiff's office, desk, and briefcase at the Attorney General's office for memoranda and corre-

spondence. It was further alleged that O'Connell searched the Welfare Litigation Division's word-processing system in order to obtain this information.

■■ ■ We first address plaintiff's contention that the trial court erred in holding that his complaint failed to state a cause of action for retaliatory discharge. The tort of retaliatory discharge is a relatively new tort in Illinois. It was first recognized by our supreme court less than a decade ago in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353. To state a valid retaliatory-discharge claim, an employee must show that his employer dismissed him in retaliation for his activities, and that the dismissal was in contravention of a clearly mandated public policy. (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 134, 421 N.E.2d 876.) In those cases which have allowed a retaliatory-discharge action to be maintained, the party sued has been the plaintiff's employer. (See *e.g., Price v. Carmack Datsun, Inc.* (1985), 109 Ill. 2d 65, 485 N.E.2d 359; *Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 485 N.E.2d 372; *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) Here, however, plaintiff is not bringing suit against his employer, the State of Illinois, but rather is suing his supervisors. Our research has revealed no Illinois case which has held that anyone other than an individual's employer is a proper party defendant in a retaliatory-discharge action.

Plaintiff, in arguing that a retaliatory-discharge action may be brought against his supervisors, cites *Zurek v. Hasten* (N.D. Ill. 1982), 553 F. Supp. 745, which notes that while Illinois law does not expressly hold that supervisors may be sued individually in a retaliatory-discharge claim, the possibility has not been foreclosed. The *Zurek* court, however, cites no authority for this proposition. The one decision relied on by that court, *Rozier v. St. Mary's Hospital* (1980), 88 Ill. App. 3d 994, 411 N.E.2d 50, is not dispositive of this point. In *Rozier*, plaintiff alleged that she was dismissed from her job at a hospital in retaliation for reporting incidents which occurred there to a local newspaper. The *Rozier* court dismissed the plaintiff's retaliatory-discharge claim because it found there were legitimate reasons for her termination, and it never reached the issue of whether the individual supervisors named as defendants were proper parties.

Moreover, the *Zurek* opinion is not binding on this court, and we further find it unpersuasive given our supreme court's recent admonition against expanding the retaliatory-discharge tort in *Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 478 N.E.2d 1354. In *Barr*, the

court stated:

> "[T]his court has not, by its *Palmateer* and *Kelsay* decisions, 'rejected a narrow interpretation of the retaliatory discharge tort' and does not 'strongly support' the expansion of the tort. The common law doctrine that an employer may discharge an employee-at-will for any reason or for no reason is still the law in Illinois, except for when the discharge violates a clearly man-dated public policy." (106 Ill. 2d 520, 525, 478 N.E.2d 1354, citing *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 128-30, 421 N.E.2d 353.)

In accordance with this admonishment, we refuse to expand the retaliatory-discharge tort in the manner now urged by plaintiff. As such, the only proper party defendant in the case of a special assistant Attorney General is his employer, the State of Illinois.

■ Furthermore, we find that defendants, as plaintiff's former supervisors at the Attorney General's office, properly invoked the defense of absolute immunity to plaintiff's claim of retaliatory discharge. In a case analogous to the present one, *Du Busk v. Harvin* (5th Cir. 1954), 212 F.2d 143, it was held that the absolute-immunity doctrine barred the plaintiff's retaliatory-discharge claim where the plaintiff alleged that his governmental supervisors "deliberately set snares for him in their malicious efforts to concoct charges" to terminate his employment. (212 F.2d 143, 144.) In dismissing the suit, the court noted the following rationale for the absolute immunity defense:

> "to protect public officials from undue harassment by civil litigation for acts committed by law to their control or supervision, and within the scope of their duties and authorities." (212 F.2d 143, 147.)

The court further stated that the existence of an improper motive does not overcome the assertion of an absolute privilege. 212 F.2d 143, 147 n.3; see also *Spalding v. Vilas* (1896), 161 U.S. 483, 40 L. Ed. 780, 16 S. Ct. 631.

This court has held that the absolute-immunity doctrine applies to tortious interference with employment relations, an action closely related to retaliatory discharge. (See *McLaughlin v. Tilendis* (1969), 115 Ill. App. 2d 148, 253 N.E.2d 85.) In *McLaughlin,* the plaintiffs maintained that they were dismissed from their teaching positions in retaliation for their union organizing activities. This court held, however, that the defense of absolute immunity extended to the defendant school superintendent, and the plaintiff's case was therefore properly dismissed.

We also note that the Seventh Circuit, in effect, applied an abso-

lute-immunity privilege to an action involving the allegedly wrongful dismissal of an assistant State's Attorney in *Livas v. Petka* (7th Cir. 1983), 711 F.2d 798. In *Livas*, the plaintiff, an assistant State's Attorney of Will County, instituted a civil rights action against the State's Attorney on the ground that he had been terminated in retaliation for his political association. The court held that even if the plaintiff's dismissal was politically motivated, he would not be entitled to the relief sought. The *Livas* court further stated that the State's Attorney "was entitled to demand absolute loyalty from his assistants" and the fact that the State's Attorney "lost confidence" in his assistant, "for ÷ whatever reason, is therefore sufficient justification for \*\*\* dismissal." 711 F.2d 798, 801. The court reasoned as follows:

> "A public prosecutor \*\*\* has the broad discretion to set whatever policies he or she believes necessary to protect the interests of that society.
>
> \* \* \*
>
> One of the problems faced by a prosecutor is that his policies are implemented by subordinates. Indeed, an Assistant State's Attorney may, in carrying out his or her duties, make some decisions that will actually create policy \*\*\*. The public interest in the efficient administration of justice requires that decisions made by such assistant prosecutors conform with the broad objectives chosen by the prosecutor." (711 F.2d 798, 800-01.)

Consequently, the Seventh Circuit affirmed the dismissal of the cause.

While *Livas* did not involve a retaliatory-discharge action, we believe the rationale articulated in that case is applicable here. As in *Livas*, plaintiff in the present case, who concedes that during his tenure he acted in the name of the Attorney General of Illinois, may be discharged for any or no reason. As special assistant Attorney General, plaintiff is in the position of a policymaker, and therefore owes a duty of loyalty to the office which he represents as well as a duty to the public to act in harmony with their elected law-enforcement officer. When this harmony is destroyed, as it was in this case, termination of the disruptive employee is warranted. Thus, we conclude that plaintiff's retaliatory-discharge claim was properly dismissed.

We further believe that the absolute-immunity defense is equally applicable to the other two counts of the plaintiff's complaint. Specifically, in the context of a defamation action against government officials, the absolute-privilege defense was upheld in *Barr v. Matteo* (1959), 360 U.S. 564, 3 L. Ed. 2d 1434, 79 S. Ct. 1335. In *Barr*, the United States Supreme Court held that a director of a governmental

agency, who issued a press release stating why he intended to suspend two employees, was immune from liability. In so holding, the court emphasized the policy underlying the absolute-immunity doctrine.

> "The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." (360 U.S. 564, 571, 3 L. Ed. 2d 1434, 1441, 79 S. Ct. 1335, 1339.)

Thus, the court made it clear that the absolute privilege is essential in promoting the effective functioning of government.

The *Barr* court also broadly interpreted the privilege's requirement that the official's actions be within the scope of his employment, stating:

> " 'The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him ***.' " (*Barr v. Matteo* (1959), 360 U.S. 564, 572, 3 L. Ed. 2d 1434, 1441-42, 79 S. Ct. 1335, 1340, quoting *Gregoire v. Biddle* (2d Cir. 1949), 177 F.2d 579, 581, *cert. denied* (1950), 339 U.S. 949, 94 L. Ed. 1363, 70 S. Ct. 803.)

Consequently, the Supreme Court held that the issuance of the press release was within the "outer perimeter" of the defendant's line of duty and that this was sufficient to render the privilege applicable, despite the allegations of malice in the complaint.

The *Barr* rationale was adopted by our supreme court in *Blair v. Walker* (1976), 64 Ill. 2d 1, 349 N.E.2d 385. In *Blair*, the plaintiffs

brought a defamation action against the former governor of Illinois for issuing two press releases calling the plaintiffs "two unscrupulous men" who "prey[ed] on a helpless woman" through illegal "dealing and manipulation." (64 Ill. 2d 1, 4-5, 459 N.E.2d 385.) While the supreme court recognized that the press releases were "calculated to injure the plaintiffs' personal and professional reputation" (64 Ill. 2d 1, 11, 459 N.E.2d 385), the court nevertheless dismissed the action reasoning:

> "Certainly the Governor of this State should be able to carry out his daily responsibilities free from concern that his actions will result in civil damage suits." (64 Ill. 2d 1, 7.)

The court therefore concluded that the governor was protected by an absolute privilege from the civil defamation action since the statements contained in the press releases were related to matters committed to his responsibility.

Plaintiff maintains that *Barr* and *Blair* are not applicable to all of the defendants in the defamation action in the present case because (1) absolute immunity applies only to the Attorney General, and not to the deputy Attorney General, first assistant Attorney General or the chief of the Welfare Litigation Division; and (2) even if the defense of absolute immunity was properly asserted, the alleged defamatory statements were not made within the defendants' scope of duties.

■■ We initially find plaintiff's first contention to be without merit. Courts have expansively interpreted the persons sheltered by the absolute-immunity defense. In *Barr*, the Supreme Court noted that the absolute-immunity doctrine should not be restricted to executive officers of cabinet rank because the "complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions" which do not "become less important simply because they are exercised by officers of lower rank in the executive hierarchy." (*Barr v. Matteo* (1959), 360 U.S. 564, 573, 3 L. Ed. 2d 1434, 1442, 79 S. Ct. 1335, 1340.) As pointed out in *McKinney v. Whitfield* (D.C. Cir. 1984), 736 F.2d 766, 769, lower Federal courts have extended the absolute-immunity defense articulated in *Barr* to "executive officials at all levels," including the regional auditor and regional administrator of the Occupational Safety and Health Administration and the meat inspector at the Department of Agriculture. See *Bishop v. Tice* (8th Cir. 1980), 622 F.2d 349; *Litvak Meat Co. v. Padilla* (D. Colo. 1979), 470 F. Supp. 1040.

The absolute-immunity doctrine has been applied by Illinois courts to various lower-level officials. (See *e.g., McLaughlin v. Tilendis*

(1969), 115 Ill. App. 2d 148, 253 N.E.2d 85 (school superintendent); *Larson v. Doner* (1961), 32 Ill. App. 2d 471, 178 N.E.2d 399 (mayor and city commissioners); *Haskell v. Perkins* (1958), 16 Ill. App. 2d 428, 148 N.E.2d 625 (school district's architect).) More recently, this court applied the doctrine of absolute immunity to the following employees of the Illinois Department of Local Government Affairs: experimental housing assistance program director, chief of the office of housing and buildings, and director of local government affairs. (See *Glass v. Jackson* (1978), 65 Ill. App. 3d 732, 382 N.E.2d 709.) Consequently, we conclude that the absolute-immunity doctrine applies to each of the defendants in the instant case.

■ We must further reject plaintiff's argument that defendant Murdock's letter and defendants' statements referring to plaintiff's conduct as "unprofessional" are not within the parameters of defendants' duties and responsibilities. We find that defendant Murdock, as deputy Attorney General, clearly was acting within the scope of his authority when he sent a letter, written in response to plaintiff's earlier letter, explaining the reasons for plaintiff's dismissal to plaintiff, plaintiff's supervisor, and other officials at the Attorney General's office. Letters criticizing an employee's job performance are customarily sent to the appropriate parties in a business or agency. Second, providing an explanation for the job termination of an assistant at the request of the assistant's agent, who was appealing on the assistant's behalf, falls within the purview of defendant Attorney General Hartigan's responsibilities. Plaintiff cites no authority to support his contention that a private conversation such as this one is not protected by an absolute privilege. Rather, the authorities cited above indicate that the only consideration is whether the statements made were reasonably related to one's duties. Lastly, each of the defendants, as plaintiff's superiors, may properly discuss with one another plaintiff's conduct on the job since it is within the scope of their authority to determine whether an employee should be discharged. Because all defendants' alleged defamatory statements were made pursuant to their duties, we find they are absolutely immune from liability for defamation.

■■ Finally, plaintiff argues that the absolute-immunity doctrine is not applicable to the invasion-of-privacy-and-seclusion count against defendant O'Connell, plaintiff's immediate supervisor. Plaintiff contends that the doctrine is a defense only to defamation and not to other torts. This argument must fail. In *McKinney v. Whitfield* (D.C. Cir. 1984), 736 F.2d 766, 769, the court recognized that the absolute-immunity doctrine has been applied to virtually every common law

tort including, but not limited to, malicious prosecution, tortious interference with business, false arrest, blackmail, fraud, and intimidation.

Recently, the absolute-immunity doctrine was applied to an invasion-of-privacy claim under facts similar to the present case. In *Williams v. Collins* (5th Cir. 1984), 728 F.2d 721, the plaintiff alleged that four government officials with whom he worked exceeded their authority in searching his desk and office, including a locked drawer, without a warrant, and seizing personal items in the desk. The court stated:

> "Whether it was part of the investigation of Williams or a simple inventory of material in the office, this action was within the outer perimeter of defendants' line of duty. It is by no means certain that Williams had a reasonable expectation of privacy in his government-furnished desk, in relation to the possibility of his supervisors entering the desk as part of an investigation of Williams' job performance or as part of an office inventory." (728 F.2d 721, 728.)

Consequently, the *Williams* court dismissed the plaintiff's invasion-of-privacy claim.

We are convinced that in light of *Williams* and the circumstances of this case, the absolute-immunity doctrine bars plaintiff's invasion of privacy claim against O'Connell. As chief of the Welfare Litigation Division at the Attorney General's office, O'Connell is responsible for the supervision, management, and output of his department. It was therefore clearly within his line of duty to retrieve the "New Trial Memorandum and Motion" prepared by plaintiff for a case handled by the Welfare Litigation Division. The fact that he had to search a State of Illinois word-processing system and a briefcase and desk located in a State of Illinois office to recover a public document does not render the privilege inapplicable. Here, similar to *Williams*, plaintiff had no reasonable expectation of privacy in government property. We also note that Illinois courts do not recognize a cause of action for intrusion upon the seclusion of another. (See *Kelly v. Franco* (1979), 72 Ill. App. 3d 642, 646, 391 N.E.2d 54; *Bureau of Credit Control v. Scott* (1976), 36 Ill. App. 3d 1006, 1009, 345 N.E.2d 37.) Accordingly, plaintiff's invasion-of-privacy-and-seclusion count was properly dismissed.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

QUINLAN, P.J., and CAMPBELL, J., concur.