**Raymond BARTMAN, et al.,**
**Plaintiffs-Appellants,**

v.

**ALLIS–CHALMERS CORPORATION, International Union United Automobile Aerospace & Agricultural Implement Workers of America and Local 248— United Automobile, Aerospace & Agricultural Implement Workers of America, Defendants-Appellees.**

No. 85–2372.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1986.

Decided Aug. 20, 1986.

Rehearing and Rehearing En Banc Denied Oct. 1, 1986.

**312**

Mark J. Rogers, Angermeier & Rogers, Milwaukee, Wis., for plaintiffs-appellants.

Miriam R. Horwitz, Zubrensky, Padden, Graf & Maloney, Milwaukee, Wis., Michael G. Cleveland, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendants-appellees.

Before BAUER, FLAUM and EASTERBROOK, Circuit Judges.

BAUER, Circuit Judge.

Appellants are sixty-five former employees of Allis-Chalmers Corporation. In 1983 they filed this law suit under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, seeking damages and reinstatement and naming Allis-Chalmers ("A–C") and their union, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America and its Local No. 248 ("the Union") as defendants. The district court granted defendants' motions for summary judgment, and this appeal followed. We affirm.

### I.

Summary judgment is properly granted only if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. In determining whether any issues of material fact are in dispute, the inferences drawn from the record must be viewed in the light most favorable to the non-moving party. *Rodeo v. Gillman*, 787 F.2d 1175 (7th Cir.1986); *Janowiak v. City of South Bend*, 750 F.2d 557, 559 (7th Cir.1984). We have frequently noted that summary judgment may be inappropriate where motive or intent are at issue, as is often true in discrimination cases. *See, e.g., Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985).

In reviewing a summary judgment this court must view the whole record, and must reverse if it is revealed that inferences concerning material facts contrary to those of the trial court may be drawn. *Powers v. Dole*, 782 F.2d 689, 694 (7th Cir.1986). We are not, however, required

to draw every *conceivable* inference, but only those that are reasonable. *Matthews v. Allis-Chalmers Corp.*, 769 F.2d 1215, 1218 (7th Cir.1985); *Parker v. Federal National Mortgage Association*, 741 F.2d 975, 980 (7th Cir.1984).

Viewed in accordance with these principles, the record discloses the following undisputed facts: A–C is a manufacturer of farm implements headquartered in the Milwaukee area. In late 1981 and 1982, during a period of substantial financial losses, A–C informed the Union that it wanted to open negotiations to seek concessions in the collective bargaining agreement then in force, which was scheduled to expire on November 1, 1982. A–C planned to ask for concessions on wages and benefits, and this desire was communicated to Union officials and to the employee population as a whole.

Negotiations actually began in October of 1981 and continued intermittently until July 31, 1982, when they were temporarily suspended due to lack of progress. As the expiration date of the old contract neared, certain A–C employees became concerned about the status of their retirement benefits under the company's Pension Plan, an agreement separate from the contract but set to expire on the same day. Among these employees were plaintiffs, who at the time were eligible to retire immediately under the "early retirement" provisions of the Pension Plan. The Plan made early retirement available to those with 30 or more years of service at A–C. Plaintiffs were not worried about the sufficiency of benefits under whatever new contract would be negotiated; rather, their concern centered on any "window" period between the expiration of the old contract and Pension Plan and ratification of the new ones.[1] A–C management, anticipating these concerns, had projected an increase in early retirements as the expiration date approached.

As the November 1 deadline neared it became clear that no new contract would be agreed upon before the old one expired. A–C and the Union, having resumed negotiations, first agreed to an extension of the old contract until November 15. When even this period proved insufficient, the company and the Union announced that work would be available for all employees at the old contract's wage scale. (A–C remained in operation under those conditions until a new contract was negotiated on January 24, 1983 and ratified on February 6.)

In the weeks before the expiration of the old contract, concern among retirement-eligible employees about the future of their pension benefits mounted. At least two persons in A–C management suggested issuance by the company of a statement that would include a promise to give employees advance warning of any benefit plan changes; this would have assured retirement-eligible employees of the opportunity to work as long as possible without actually risking their benefits, which is exactly what plaintiffs wanted to do. The Union also brought up the possibility of a statement in its negotiations with A–C in November of 1982. Ultimately A–C declined to issue such a statement.[2]

A substantial number of eligible employees, including plaintiffs, retired just before the expiration of the old contract. However, A–C did allow those retiring during November of 1982 to rescind their retirements and return to work by November 30 without loss of seniority, and some did so. A total of 320 employees retired between October 31 and November 15, not including 61 who elected to rescind their retirements and go back to work before the end of November.

Negotiations continued after the old contract expired. Plaintiffs asked the Union

---

1. Actually, upon expiration of the Pension Plan A–C had the right to unilaterally suspend, continue or modify the Plan.

2. The record indicates that Dan Kern, Director of Employee Relations for A–C, responded to several individual employees' inquiries by stating that A–C had no imminent plans to change benefits and that the Union would be advised prior to any such changes. This statement was never formally issued by A–C.

to raise the subject of their retirements, which they had come to view as "forced," in those negotiations. The subject was raised at bargaining sessions in December, 1982 but A–C refused to give in on the issue. In January of 1983 the General Counsel of the National Labor Relations Board moved to add charges related to the retirements to unfair labor practice charges already pending against A–C concerning its conduct in bargaining in 1982. When the new contract was finally ratified in February of 1983, the NLRB charges were dismissed as part of the contract settlement.

### II.

■ In granting A–C's motion for summary judgment, the district court concluded that plaintiffs could not make out a *prima facie* case of age discrimination because they could not show that they were "constructively discharged." The court found that plaintiffs' status was not made intolerable by any action on A–C's part, but rather by uncertainty about their future due to the imminent expiration of the contract. There resulted, in the court's words, "retirement decisions that, while agonizing, were voluntary." *Decision and Order* of July 31, 1985, at p. 8.[3]

Plaintiffs argue that the district court failed to analyze their case on a disparate impact theory, under which an employment practice that is neutral on its face is unlawful if in fact it has a disproportionate impact on a protected group, in this case older workers. *See, e.g., Griffin v. Board of Regents of Regency Universities*, 795 F.2d 1281, 1287 (7th Cir.1986) (Title VII case). Plaintiffs note the unusually large number of early retirements in the days immediate-

ly preceding the expiration of the contract, which in their view demonstrates the necessary disparate impact. The "employment practice" plaintiffs challenge is A–C's decision to make work available during the "window" period at old contract rates, an "employment opportunity" neutral on its face but, as plaintiffs see it, impossible for older workers, *i.e.* those eligible for early retirement, to take advantage of without assurances that their retirement benefits would not be lost.

We agree with the district court's conclusion that plaintiffs have failed to demonstrate that their retirements amounted to constructive discharges by A–C. Contrary to plaintiffs' assertions in this court, the district judge was obviously aware that plaintiffs would have *preferred* to remain on their jobs, as is demonstrated by his sensitivity to the "agonizing" nature of the choices they faced. However, an employee is not constructively discharged whenever he elects to leave a job he would, on the whole, rather keep, without regard to the actual reason for his departure. An employer constructively discharges an employee only if it *"makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation ..."* Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 926 (5th Cir.1982), *quoting Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 144 (5th Cir. 1975) (emphasis added). In the instant case the condition that "made" plaintiffs' situation apparently intolerable to them was not any action of A–C, but rather the expiration of the Pension Plan, an event brought about by the failure of the contract negotiations and the passage of time. Plaintiffs have not argued, nor could they

---

3. The district court viewed plaintiffs' claim that A–C was obligated to publicly declare in advance its intentions with regard to the Pension Plan as presenting a potential conflict between plaintiffs' collective rights under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, and their individual rights under the ADEA. *See E.E.O.C. v. County of Calumet*, 686 F.2d 1249 (7th Cir.1982). A–C argued in the district court that the requested statement would have constituted direct bargaining with a separate group of employees in derogation of its obligation to bargain with the Union. On appeal, though, plaintiffs make it clear that they were not concerned with what provisions the new contract and Pension Plan would hold, but rather feared the consequences of retiring during the "window" period when no contract was in force. Under this argument, then, no conflict arises between the two statutes, although the bargaining situation remains important in analyzing these facts.

on this record, that A–C delayed the contract process in order to induce their retirements by allowing the plan to expire.

Another way to look at it is to say that plaintiffs have failed to present evidence that any action by A–C caused their departure. Proof that the disputed employment practice was the cause of the allegedly unlawful condition is a requirement of liability under a disparate impact theory. *E.E.O.C. v. Greyhound Lines, Inc.,* 635 F.2d 188, 193 (3rd Cir.1980); *see also United States v. Town of Cicero,* 786 F.2d 331, 336 (7th Cir.1986) (Posner, J., concurring and dissenting). Plaintiffs retired because they did not want to risk the loss of their pension benefits if they retired during the period between contracts. As observed above, the expiration of the contract was the cause of the "window" period. The extension of the "opportunity" to work without a contract did not change the status of plaintiffs' pension benefits; even if A–C had chosen to lock out the Union, the same danger of loss of benefits would have existed during the period between contracts.

The "employment practice" that is really at the heart of plaintiffs' argument is A–C's refusal to declare its intentions about pension rights in advance of the expiration of the contract. This argument must fail because there is no "act" by A–C involved; rather, plaintiffs complain about the absence of an act. We are aware that it might be possible in some cases to characterize positive acts in negative terms, but this is not such a case. A–C was not obligated to rescue plaintiffs from a predicament for which it was not responsible. To require it to do so would be to require A–C to treat older workers *better* than workers generally. The ADEA imposes no such obligation. *Tice v. Lampert Yards, Inc.,* 761 F.2d 1210, 1217 (7th Cir.1985).

### III.

■ To the extent plaintiffs' claims against the Union rest on its alleged acquiesence in A–C's conduct, those claims must fall in light of our disposition set forth in part II above. Plaintiffs also fault the Union for failing to pursue their reinstatement in the collective bargaining proceedings that took place after they retired and the old contract expired.

Plaintiffs correctly contend, as we held in *E.E.O.C. v. County of Calumet,* 686 F.2d 1249, 1256–57 (7th Cir.1982), that a labor union may not, as part of the collective bargaining process, waive employee rights under the ADEA. *See generally Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 51–52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974). As we have held above, though, plaintiffs' rights under the ADEA were not violated. Plaintiffs claim is more properly viewed as alleging that the Union breached its duty of fair representation by failing to obtain their reinstatement through the bargaining process, and that this failure to bargain hard enough on their behalf was the result of the Union's view that, as older workers, they were more expendable.

In *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 868 (7th Cir.1985), we held that employees alleging racial discrimination by their Union in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* could make out a *prima facie* case in the context of a breach of an existing collective bargaining agreement. Like Title VII, the ADEA is specifically applicable to labor organizations, 29 U.S.C. § 623(c), and we may assume (without deciding) that plaintiffs could state an ADEA claim against the Union based on failure to bargain with sufficient vigor. Nevertheless the record assembled below does not support plaintiffs' contention that the Union simply abandoned them because it felt that the interests of younger workers were more important. In fact, several hundred other A–C workers lost their jobs at the time of the 1982 negotiations as a result of plant closings and subcontracting of some of A–C's work outside the company. These job losses were among the subjects of the NLRB charges pending during the negotia-

tions and dropped as part of the agreement on the new contract.[4]

Plaintiffs' principal evidence of the Union's intent to discriminate consists of statements allegedly made by Richard Roznik, president of the Union's Local 248 at A–C, to two of the plaintiffs, as well as statements made in Roznik's own affidavit filed in the district court. Plaintiff Elanor West stated that she heard Roznik tell a group of retirees that he "didn't have time to worry about 'your little problem' and that he was concerned about 'the guy with seven years that's on lay off.'" Plaintiff Al Molnar stated in his affidavit that Roznik suggested he take his complaints to the NLRB "as he was more concerned about the younger workers who had no vested pension rights." For purposes of this appeal we must assume that the plaintiffs' versions of Roznik's statements are accurate.

Roznik's own affidavit describes several incidents at bargaining sessions in November and December, 1982 in which Union negotiators attempted either (1) to get an extension of the period within which recently retired employees could rescind their retirements, or (2) to gain reinstatement for them. Although Roznik was not the chief negotiator, he did give four reasons why he did not thereafter continue to raise the issue of plaintiffs' retirements. These reasons included his conclusion that plaintiffs' retirements were voluntary, his desire to avoid further displacement of active workers as a result of any recalls of retirees, and his feeling that the Union had gotten all it could out of A–C (in the form of the contract extension and the November retirement rescission period).[5]

The first of these conclusions has turned out to be correct. The second is regarded by plaintiffs as concrete evidence of discrimination; coupled with Roznik's state-ments to West and Molnar, it is said to demonstrate that plaintiff's rights were discriminatorily subordinated to those of younger workers. We do not believe that this evidence will support such a conclusion. At most, these statements show that the Union negotiators were attempting to advance many competing concerns. Among these were plaintiffs' retirements which, as we have held, implicated no statutory rights. Absent a violation of law, the Union was not obliged to press plaintiffs' case at any expense.

The record reflects that the Union lost a lot of fights in the course of bargaining, and plaintiffs' was one of them. Roznik's decision that plaintiffs' cause was lost and that more could be done for other workers was not an act of age discrimination when viewed in the context of collective bargaining on a full slate of employment issues and in the absence of any statutory rights. The Union's duties in this case were conflicting, and its resolution, at least as expressed by its Local's President, reflect a pragmatic accounting of all relevant facts and factors, rather than a decision to "dump" workers perceived to be of less value.

## IV.

The district court's grant of summary judgment to defendants is

AFFIRMED.

---

**4.** As noted above, charges concerning plaintiffs' retirements were never formally added to those pending before the NLRB. The General Counsel's request to add those charges to the complaint was also abandoned when the agreement was reached.

**5.** The Union argues initially that it had *no* obligation to bargain on behalf of plaintiffs because they were voluntary retirees. We need not reach the correctness of this argument because the Union *did* make efforts in their behalf, efforts which we find herein to have been made in a non-discriminatory manner.