**Stanley E. MILLER, Plaintiff,**

v.

**STATE OF ILLINOIS, et al.,
Defendants.**

**No. 86 C 2983.**

United States District Court,
N.D. Illinois, E.D.

March 8, 1988.

---

Gerald Sweeney, Lord, Bissell & Brook, Chicago, Ill., for plaintiff.

Gladys Stevens, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Stanley Miller ("Miller") has sued his former employer, the Illinois Department of Commerce and Community Affairs ("Department"), and three Department officials, claiming violations of:

1. 42 U.S.C. § 2000e–2 ("Title VII"),
2. 42 U.S.C. § 1981 ("Section 1981"),
3. 42 U.S.C. § 1983 ("Section 1983") and
4. the Illinois common law tort of retaliatory discharge.

All defendants have moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, defendants' motion is granted in its entirety.

### Facts [1]

Miller is a 43–year–old black man who was hired as an Industrial and Community

1. Familiar Rule 56 principles impose on the party moving for summary judgment the bur-

Development Representative I in Department's Chicago office on January 16, 1984. Defendant Harry Pestine ("Pestine"), a regional manager in Department's Bureau of Marketing, was Miller's immediate supervisor.

Miller's salary as a probationary employee was $1,460 per month. On July 1, 1984 his salary was increased to $1,533 monthly.[2] During the first three or four months of Miller's employment he had little contact with Pestine, apparently because Miller was in training. After his training was completed Miller was assigned to assist in economic development of the west side of Chicago. He was responsible for communicating with local businesses and community groups to assist them in obtaining funds and resources for job development.

By all accounts Miller was an enthusiastic and hardworking Representative. On January 31, 1985 Department's Deputy Director for the Bureau of Marketing, defendant Sharon Sharp ("Sharp"), wrote to Director Mike Woelffer ("Woelffer") lauding Miller's efforts and recommending that he receive an 11% salary increase (D. Mem. Ex. A. 7), the maximum allowed under Department's merit system (D. Mem. Ex. A. 6). On February 21 Woelffer approved a 7%[3] merit increase for Miller, the lowest

increase commensurate with his "superior" rating.

Miller was apparently never happy with Pestine as a supervisor, and their relationship was rocky. He points to a number of ways in which Pestine "harassed" him:

1. Pestine called at 4:55 p.m. on about four different days, with no apparent purpose other than to see if Miller was still working (Miller Dep. 116–17).

2. Pestine ordered Miller to continue to seek a loan for a company when local organizations had asked Miller to withdraw (id. 117–22).

3. Miller was told to assure two entities that Department funds would be forthcoming, only to discover later that they were not, thus undercutting his effectiveness (id. 122–24).[4]

4. Pestine took the best cases for himself (id. 124–25).

5. Pestine did not authorize Miller to use a motor pool car when Miller felt he needed one (P. Mem. Exs. 12, 13).

Miller also saw Pestine as an ineffective manager, objecting to the tone of his relations with both Miller and other Representatives.

In June 1985 Miller requested a meeting with Woelffer to discuss what he perceived

den of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court draws all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Miller (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). This statement of facts and the later discussion conforms to that requirement, citing the parties' submissions this way:

 1. Memorandum in Support of Defendants' Motion for Summary Judgment: "D.Mem.—."

 2. Plaintiff's Reply to Defendants' Motion for Summary Judgment: "P.Mem.—."

 3. Defendants' Reply Memorandum in Support of their Motion for Summary Judgment: "D.R.Mem.—."

 4. Plaintiff's Response to Defendants' Reply Memorandum: "P.R.Mem.—."

As part of their opening memorandum, defendants have submitted a "Statement of Material Facts" pursuant to this District Court's General Rule 12(e). While Miller has not submitted a statement of contested facts as required by General Rule 12(f), his Memorandum sufficiently

identifies the disputed factual issues. This opinion accordingly deals with the merits, though Miller's counsel should realize such failure to comply with General Rule 12(f) would have entitled this Court, under the terms of that rule, to treat defendants' version of the material facts as having been admitted by Miller.

**2.** No reason for this increase is given in the record. D.Mem.Ex.A. 4 reflects his probationary period ended July 18, 1984 but does not indicate why the raise was dated July 1.

**3.** These 11% and 7% figures conform to the numbers used by both parties. In fact Miller's raise was $135 or 8.8% of his $1,533 monthly salary. But $135 is 7% of the midpoint of the salary range for Miller's position, a figure Department apparently uses in calculating and describing merit increases.

**4.** Miller's deposition testimony does not really tie this grievance to Pestine. Rather it merely asserts Miller thinks the events must have involved Pestine because he was Miller's supervisor.

as problems in Department. His request was denied. On July 17 Miller filed employment discrimination charges with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"), based on the level of his January pay raise.

On August 16, 1985 Sam Flowers ("Flowers"), the Chairman of Project 80 (a community development group Miller worked with), called Pestine to tell him that Miller had asked Project 80 for reimbursement of $2,500 in expenses on his Diners Club card.[5] Miller had attended a Project 80 meeting on August 7 and presented a demand letter he had received from Diners Club for the delinquent amount. Pestine was concerned by Flowers' call because Department does not charge community groups for its services.

Pestine attended a Project 80 meeting August 23, and he later requested written confirmation of Miller's request from the group. He then asked Department's personnel chief Carol Hibma ("Hibma")[6] how to proceed. Pestine also received a letter from James Hopkins ("Hopkins") of Project 80 confirming that Miller had requested the funds. As a result of all this, Pestine decided to recommend Miller be suspended pending discharge.

On September 3 Pestine called Miller into a meeting at which Sharp and defendant Evelyn Hoffman ("Hoffman"), Department's Chicago legal counsel, were present. Pestine gave Miller a memorandum saying the request for reimbursement violated Department's professional standards and notifying Miller:

I am recommending to the Director that he initiate a suspension pending discharge for up to 30 days so that this incident can be investigated to determine if discharge is appropriate.

If the Director agrees he will send you by certified mail a DP–2 effecting the suspension.

Pestine also told Miller he could respond to the charge against him in writing within 48 hours. Miller resigned orally. During the meeting Hoffman said nothing and nothing was said to her. Sharp's only participation was to offer Miller assistance in finding another position with the State.

On September 4 Miller gave Pestine a response to the allegations. Next day he tendered a written resignation, effective September 6. On that day he filed charges with IDHR and EEOC alleging race discrimination and retaliatory discharge.

### Race Discrimination

Miller's Title VII claim is that he was discharged on the basis of race.[7] *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) summarized the familiar burden-shifting order of proof in such a case (citations omitted):

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Of course, in all this it must be remembered that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plain-

---

5. Miller had obtained a Diners Club card under a state program. He was allowed to charge both business and personal expenses on the card and was reimbursed by Department for business expenses.

6. It is unclear from the record and memoranda whether Hibma now styles herself as Killian or

Hibma–Killian. This opinion will use her name as of 1985.

7. This Court's November 5, 1986 memorandum order held Miller's claims for the January 1985 raise and for the asserted denial of promotions were not sufficiently related to his EEOC charge to be raised in this action.

tiff" (*id.* at 253, 101 S.Ct. at 1093).[8] To the extent Miller's claims under Sections 1981 and 1983 rest on race discrimination, the same principles apply (*Friedel v. City of Madison,* 832 F.2d 965, 971 (7th Cir.1987)). Therefore Miller's race discrimination claims may all be dealt with at once.

### 1. *Prima Facie Case*

Miller may establish a prima facie case either through direct evidence (e.g., *Webb v. City of Chester,* 813 F.2d 824, 829–30 (7th Cir.1987)) or by inference. Because he has adduced no direct evidence whatever of racial animus on the part of Department or its managers, he must perforce rely on indirect evidence.

■ In that respect our Court of Appeals has cautioned that "the elements of a prima facie case will vary depending upon the particular facts of various allegations of discrimination" (*Friedel,* 832 F.2d at 972). When a plaintiff alleges discriminatory firing the prima facie case has been described as containing four elements (*Mason v. Pierce,* 774 F.2d 825, 828 (7th Cir. 1985)):

> (1) she belongs to the protected class, (2) she was qualified for the position, (3) she suffered an adverse employment decision, and (4) the employer sought to replace her.

Here Miller contends he was constructively discharged,[9] so it is reasonable to look to the same elements (see *Hights v. International Harvester Co.,* 675 F.Supp. 418, 420 n. 7 (N.D.Ill.1987)).

There is no question Miller satisfies the first, second and fourth elements of the prima facie case. He is black, his performance ratings were more than satisfactory and he was replaced (P. Mem. Ex. 15).[10] Thus the only issue is the presence or absence of the third element—in this instance whether he was constructively discharged.

■ Constructive discharge occurs when an employer "*makes* an employee's working conditions so intolerable that the employee is forced into an involuntary resignation" (*Bartman v. Allis Chalmers Corp.,* 799 F.2d 311, 314 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987),[11] quoting *Vaughn v. Pool Offshore Co.,* 683 F.2d 922, 926 (5th Cir.1982) (emphasis added in *Bartman* )).[12] On that score the question is whether "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" (*Vaughn, id.,* quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114 (1st Cir.1977)). Miller

---

**8.** *Burdine* is phrased in terms of burdens of proof at trial. On this summary judgment motion, though, Miller does not have to carry the day. Rather he need only show the existence of any triable factual issue that, if ultimately resolved in his favor, would meet his burden at trial.

**9.** Miller has phrased his complaint in terms of constructive discharge rather than claiming the proposed suspension pending discharge was itself the "adverse employment decision." That might seem unwise, given the difficulty in showing constructive discharge discussed in the text. Yet there is a logic to his approach. Absent a constructive discharge he can show no damages from the planned disciplinary action: His voluntary resignation stopped the disciplinary process before any suspension was imposed.

**10.** Miller's replacement was a black female. That fact would tend to undercut any inference of race discrimination if Miller were able to meet all four elements of the *Moore* prima facie case.

**11.** *Bartman* is a case under the Age Discrimination in Employment Act rather than a race discrimination case. There should, however, be no difference in the standard for what constitutes constructive discharge in the two instances. Indeed *Vaughn,* from which our Court of Appeals drew the standard in *Bartman,* was a Title VII race discrimination case.

**12.** While some courts have added the requirement that the employer must have intentionally forced the employee to resign (e.g., *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986)), our Court of Appeals has not determined whether that requirement applies (see *Henn v. National Geographic Society,* 819 F.2d 824, 829 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 454, 98 L.Ed.2d 394 (1987); Comment, *Constructive Discharge Under Title VII and the ADEA* (hereafter "Comment"), 53 U.Chi.L.Rev. 561, 563–68 & n. 15 (1986)). That is really irrelevant, however, because Miller cannot show conditions were so intolerable he had to resign.

says the "extraordinary disciplinary proceeding" coupled with Pestine's treatment of him created such intolerable working conditions.

■ Even giving Miller the benefit of the favorable inferences to which he is entitled on this motion, that cannot objectively be said of Pestine's conduct before the Project 80 episode. Even assuming the accuracy of Miller's charges, the most reasonable inference is that Pestine was a heavy-handed manager who dealt poorly with subordinates. That kind of supervisor is (unfortunately) not a rare breed, and simple mismanagement does not constitute constructive discharge.

■ True enough, if Pestine had in fact sought to harass Miller because of his race, Pestine's actions might very well have constituted violations of Title VII. But not every violation equals a constructive discharge (see generally Comment at 565–66 and cases cited at nn. 19–28). Miller's grievances are really minor annoyances, not the wholesale abuse required to find constructive discharge (compare *Henn*, 819 F.2d at 829–30 (finding no constructive discharge in threats of unpleasant consequences if performance doesn't improve) with *Parrett v. City of Connersville*, 737 F.2d 690, 693–94 (7th Cir.1984), *cert. dismissed*, 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985) (finding constructive discharge in assignment of police officer to sit in former storage closet with no phone and no work to do)).

■ Nor is anything added by the September 3 meeting, when Pestine told Miller he was recommending suspension pending discharge and investigation of Miller's request to Project 80. Certainly that planned investigation cannot be seen as objectively unreasonable. Investigation of allegations suggesting employee misconduct is routine, and Miller offers no evidence suggesting the investigation would have been abusive or intolerable. As for the meeting itself, it can safely be assumed Miller reasonably found the experience unpleasant, but he does not say the conduct of the other participants was so egregious as to force his resignation.

## 2. Pretext

Because Miller thus cannot establish a prima facie case of racial discrimination, his claims must fail. However, even if the facts (viewed most favorably) had supported a finding of constructive discharge (as it has already been held they did not), he would lose on the pretext issue.

■ It will be recalled the second step in the *Burdine* analysis is for the employer to articulate a nondiscriminatory reason for its action. Department has certainly done that by pointing to the information it received about Miller's request directed to Project 80. Under *Burdine* the burden therefore shifts to Miller to show Department's rationale is a pretext for discrimination.

■ Miller cannot win on that issue merely by showing he was innocent of any wrongdoing.[13] Nor can he win by showing Pestine knew Miller was innocent and used the Project 80 incident as a pretext to get rid of him because of personal animus. Rather Miller must show a pretext *for discrimination* (*Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 488, 98 L.Ed. 2d 486 (1987)). Suffice to say he has offered no evidence of any kind suggesting racially discriminatory animus on the part of any defendant.

■ Miller's strongest evidence of pretext is an August 27 handwritten note by

---

**13.** Miller says Flowers offered to pay the Diners Club charges and the Project 80 Board merely asked for an itemization of those charges. Miller adds he was always willing to pay the charges himself. On the current motion his version of the events must be accepted (though the only evidence tendered on this motion reflecting Miller's offer to pay is his assertion in the September 4, 1985 response to Pestine's charges that he had told Project 80 he was willing to pay (P.Mem.Ex. 22 at 2)). But it cannot be gainsaid there are alternative non-innocent explanations of Miller's request. If the Diners Club charges were for personal expenditures, Miller's request would be serious misconduct (perhaps even criminal). Pestine was certainly entitled to consider that possibility and initiate an investigation.

Pestine as to his conversation with Hibma. It says (P. Mem. Ex. 19):

1. Suspend pending discharge
2. If proven then discharge
3. If not then discipline

One reasonable interpretation of that note is that Pestine intended to punish Miller even if the charges proved groundless.[14] But nothing in the note (or in any other aspect of the evidence) suggests race was a motivating factor. No such inference can reasonably be drawn on this record.

### 3. *Conclusion*

Each perspective on the *Burdine* analysis leads to the same result. Summary judgment for defendants is clearly warranted on Miller's race discrimination claims.

### *Retaliation*

Miller also asserts he was discharged in retaliation for (1) filing the discrimination charge with the EEOC and (2) seeking to meet with his supervisors to discuss improper conduct of other state employees. Although Miller makes those contentions as part of his pendent state law claim, they could also state claims under Title VII and Section 1983 respectively. Each will therefore be discussed here.

One overriding fact defeats all those three claims: Miller was not constructively discharged. Absent a discharge his state law claim fails, as do his federal claims in the form he has cast them. Nonetheless defendants might also be found to have violated Title VII or Section 1983 if Miller had been disciplined (though not actually discharged) in retaliation for protected conduct, so those claims will be addressed.

### 1. *Section 1983*

■ Discipline of a public employee for engaging in protected speech infringes his or her constitutionally protected liberty interest (e.g., *Rankin v. McPherson*, —— U.S. ——, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987)). Miller says he tried to arrange a meeting with Woelffer to discuss Department problems, but Woelffer refused to meet with him. In the course of Miller's attempt to arrange a meeting with Woelffer, Pestine's superior John Baldwin sent Pestine a handwritten note saying (P. Mem. Ex. 8; bracketed material added by this Court, underscored material underscored three times in original):

> I need to know what is going on here. We have told Stan [Miller] that he can come to us and should come to us regarding problems or initiatives before he approaches Mike [Woelffer] or Sharon [Sharp]. I would like you to arrange a meeting (again) between Stan and us regarding this request. Am documenting this because Mike has had it up to the proverbial neck line with Stan—he wants Stan *fired*.

That suffices to raise an inference that Miller's superiors wanted to "retaliate" for his efforts to meet with Woelffer.[15]

At the outset this Court must consider whether Miller's "speech may be 'fairly characterized as constituting speech on a matter of public concern'" (*Rankin*, 107 S.Ct. at 2897, quoting *Connick v. Myers*,

---

**14.** D.R.Mem. 6 advances an alternate reading of the note, going so far as to add a word to its language without clearly identifying it had done so. In the memorandum's version Pestine's third directive has to be read as implicitly containing the same "if proven" condition as the second, with the word "not" in the third directive meaning "if not discharged." Pestine himself offered yet a third interpretation, where the choice between the second and third directive hinged on what was proved. He says if it turned out the expenses were personal Miller was to be discharged, whereas if they were business-related he would be disciplined for violating Department policy (Pestine Dep. at 90). This accords with Hibma's August 27, 1985 memo to Woelffer describing the conversation

(P.Mem.Ex. 18). In any event it would seem odd that any supervisor (even a foolish one) out to get a subordinate would commit himself to paper on so blatant a basis as Miller's reading would represent. But while the interpretations offered by both Pestine and D.Mem. 6 are also reasonable (or might even be found more reasonable by a jury), by urging this Court to accept those interpretations on summary judgment defendants have lost sight of this Court's proper role (see n. 1).

**15.** Defendants also attempt to downplay the significance of that memo, but again Miller is entitled to favorable inferences.

461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983)). Miller's memorandum listing proposed topics for the meeting is extraordinarily sketchy—including such items as "Economics" and "Housing in Chicago" (P. Mem. Ex. 9). No departmental director can be faulted for refusing to meet with a low-level employee based on such a nebulous request. However, the topics Miller wanted to talk about are certainly matters of public concern—and if his superiors wanted to discipline Miller because of the intended content of his speech or because he wanted to speak at all, his First Amendment rights would certainly be implicated.

 Yet having said all that, this Court finds nothing in the record to support the inference Woelffer or anyone else sought to punish Miller for the *content* of his speech. Nor does the record support any inference any defendant sought to muzzle Miller. First, the damaging note from Baldwin to Pestine was written before Miller had provided Woelffer with even the sketchy list of planned topics. Second, read as a whole, the note suggests Miller's superiors were upset with his failure to go through channels rather than with (1) the substance of anything he might have said or (2) the fact he wanted to discuss issues at all. Third and most important, there is no evidence Miller's superiors sought to silence him on any subject. True enough, Woelffer refused to meet with him and may have wanted to punish him for bypassing available and orderly procedures, but Miller's First Amendment right to speak does not require Woelffer (or anyone else) to listen (cf. *Minnesota Board for Community Colleges v. Knight,* 465 U.S. 271, 283–87, 104 S.Ct. 1058, 1065–67, 79 L.Ed.2d 299 (1984)).

Hence there is no indication Miller's supervisors sought to punish him for the content of his speech or for wanting to speak at all. That means there is no need to address the second step of the analysis outlined in *Rankin:* whether the employer's interest in avoiding disruption of the workplace outweighs the infringement on speech.[16]

### 2. *Title VII*

Title VII also prohibits employers from retaliating against employees for filing employment discrimination charges (42 U.S.C. § 2000e-3). Pestine's recommendation for Miller's suspension came about ten weeks after Miller filed his first claim with IDHR and EEOC.

 Title VII claims for retaliatory discharge also trigger the *Burdine* burden-shifting process (*Miller v. Fairchild Industries, Inc.,* 797 F.2d 727, 730 (9th Cir.1986)). To establish his prima facie case Miller must show (1) he engaged in a protected activity, (2) Department subjected him to an adverse employment action and (3) there was a "causal link between the protected activity and the employer's action" (*id.* at 731).

Miller has no difficulty meeting those first two elements. As for the third, the only evidence of a causal link is the proximity in time between Miller's complaint and the later suspension proposal.[17] Even though that alone has been held insufficient to justify a conclusion of a causal link after trial (*Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986)), this opinion will assume for the moment that it creates enough of an inference to survive at this stage (*Miller,* 797 F.2d at 731).

---

**16.** To the extent Miller's Section 1983 claim is based on retaliation for filing the discrimination charge, that claim may be foreclosed by our Court of Appeals' recent dictum in *Yatvin v. Madison Metropolitan School District,* 840 F.2d 412, 418–20 (7th Cir.1988). *Yatvin* held plaintiff in that case had waived Section 1983 claims charging retaliation for filing a lawsuit (*id.* at 420) but observed that not every complaint of discrimination is a protected First Amendment

activity (*id.* at 418–20). Here, however, Miller clearly raises a retaliation claim under Title VII, so it is not really necessary to resolve the issue left open in *Yatvin.*

**17.** Baldwin's note saying that Woelffer wanted Miller fired predated Miller's complaint, so it raises no inference in Miller's favor.

"For the moment" is a singularly appropriate phrase here, for any such potential success in showing a prima facie case is fleeting: Unquestionably defendants have articulated a legitimate reason to recommend discharge, and Miller has offered nothing to suggest that reason is a pretext for retaliation. This Court need not repeat the equally-applicable discussion of the pretext issue in the preceding section of this opinion dealing with the race discrimination claims. Miller fails for essentially the same reason here.

### 3. Illinois Law

Illinois recognizes the tort of retaliatory discharge when an employer discharges an employee in retaliation for his exercise of a right in violation of a "clearly mandated public policy" (*Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 129–30, 52 Ill.Dec. 13, 15, 421 N.E.2d 876, 878 (1981)). But as the discussion in *Palmateer, id.* at 130–32, 52 Ill.Dec. at 15–17, 421 N.E.2d at 878–80 indicates, the contours of "clearly mandated public policy" are anything but clear.

*Barr v. Kelso–Burnett Co.*, 106 Ill.2d 520, 88 Ill.Dec. 628, 478 N.E.2d 1354 (1985) rejected an action for retaliatory discharge based on the claimed infringement of an employee's First Amendment rights. However, *Barr* involved a private employer, and the Illinois Supreme Court stressed that the First Amendment is directed only to governmental actors (*id.* at 526–28, 88 Ill.Dec. at 630–31, 478 N.E.2d at 1356–57). When as here the employer *is* a governmental actor, there is no doubt Illinois would regard the First Amendment and the parallel state constitutional provision (Ill. Const. Art. I, § 4) as establishing a clearly mandated public policy.

That conclusion gets Miller to the starting line, but he doesn't get off the blocks. As shown in the section of this opinion on his Section 1983 claim, the evidence at best suggests retaliation for trying to meet with Woelffer, and not for First Amendment activities. Miller does not suggest his rights on that score are any broader under Illinois law, so the Illinois claim also loses.

Illinois also recognizes claims for retaliatory discharge for filing a claim under the Illinois Human Rights Act (*Loyola University v. Human Rights Commission*, 149 Ill.App.3d 8, 17–18, 102 Ill.Dec. 746, 752, 500 N.E.2d 639, 645 (1st Dist. 1986)). It is unclear whether such a claim may be raised in court rather than, in the first instance, before IDHR (see *Mein v. Masonite Corp.*, 109 Ill.2d 1, 92 Ill.Dec. 501, 485 N.E.2d 312 (1985), holding no private actions exist for violations of the Human Rights Act). In any case, because Illinois applies the *Burdine* burden-shifting approach to retaliation claims under its Act (*Loyola University*, 149 Ill.App.3d at 17, 102 Ill.Dec. at 752, 500 N.E.2d at 645) it is clear that Miller's Illinois retaliation claim succumbs for the same reasons as his Title VII retaliation claim.[18]

### Due Process

Miller can also press a claim under Section 1983 if defendants' actions deprived him of property or liberty without due process of law. Defendants concede Miller's interest in his position is a property right, entitling him to due process in any deprivation. Miller also asserts defendants have deprived him of a liberty interest because the existence of the September 3 memo from Pestine recommending suspension has prevented him from obtaining a position with the state.

---

**18.** There is an independent reason to grant Pestine, Sharp and Hoffman summary judgment on the state law claim. In *Zurek v. Hasten*, 553 F.Supp. 745, 749 (N.D.Ill.1982) this Court found "none of the handful of Illinois cases involving the retaliatory discharge tort has foreclosed this possibility" of bringing such claims against the responsible supervisors as well as the employer itself. But since then *Morton v. Hartigan*, 145 Ill.App.3d 417, 421–22, 99 Ill.Dec. 424, 426–427, 495 N.E.2d 1159, 1161–62 (1st Dist.1986) has done precisely that, explicitly refusing to accept the *Zurek* suggestion in light of the Illinois Supreme Court's intervening admonition in *Barr*, 106 Ill.2d at 525, 88 Ill.Dec. at 630, 478 N.E.2d at 1356 against undue expansion of the tort. As always, it is what Illinois courts now say Illinois law is, not what this Court may have anticipated some years ago, that controls.

■ However, Miller has tendered no evidence either of an inability to obtain state employment or of such purported inability being caused by the contents of Department's personnel records. Parties opposing summary judgment must tender evidence showing there is a genuine issue for trial and may not rest on pleadings or unsworn memoranda of law (Rule 56(e); *Celotex*, 106 S.Ct. at 2553). Defendants tendered their sworn response to interrogatories saying there had been no requests to see Miller's personnel record (D.R.Mem. Ex.R). There is simply nothing to rebut that.[19] There being no deprivation of a liberty interest, this opinion need turn only to a review of Miller's property interest claim.

■ Miller's interest in continued employment is substantial, and Department generally cannot deprive him of that interest without a pre-deprivation hearing (*Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542–46, 105 S.Ct. 1487, 1493–95, 84 L.Ed.2d 494 (1985)). That hearing should provide "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action" (*id.* at 545–46, 105 S.Ct. at 1495). All Miller was entitled to *before discharge* was notice of the charges, an explanation of the evidence against him and an opportunity to respond (*id.* at 546, 105 S.Ct. at 1495).

In response to *Loudermill*, Department adopted regulations designed to provide due process to state employees facing discharge or suspension pending discharge (P.Mem.Ex. 28). Both sides agree those procedures would have satisfied due process, and both acknowledge the procedures were not utilized here.

Defendants say it is Miller's fault the pretermination procedures were not followed, because he resigned before Department could initiate the procedure. Miller says the September 3 meeting was not sanctioned by Department's procedures, so it violated due process and he was constructively discharged.

■ Miller's claim is simply untenable. He says basically three things happened at the September 3 meeting:

1. He was given the memo describing (albeit briefly and without documentation) the charges against him.

2. He was advised he could respond in writing within 48 hours.

3. Sharp offered assistance in obtaining another job.

Nothing there is even remotely violative of due process. It is possible to imagine a meeting where supervisors browbeat an employer into resigning rather than defending himself, but Miller's own description of the meeting suggests nothing of the sort. Rather, all the evidence says Miller was given notice of the charges against him and an opportunity to respond—the very touchstones of due process.

True enough, the meeting itself may not have been a sufficient "hearing" to satisfy due process before a discharge. But Miller was not discharged after the meeting—he quit. Absent any showing Department would have ignored its regulations that clearly satisfy due process (and nothing of the sort is suggested here), Miller cannot now be heard to complain.[20]

19. Miller raised the potential deprivation of a liberty interest very late in the game—it is not clearly encompassed by his Third Amended Complaint and was explicitly raised only in his response to the current motion (P.Mem. 10). When D.R.Mem. 7–8 noted the absence of an evidentiary basis for the claim, Miller was given leave to file a surreply and Fourth Amended Complaint. His Fourth Amended Complaint cured the pleading defect, but the evidentiary deficiencies remain.

20. It would be bizarre indeed to rule that because an employee's first contact with the disciplinary system—not a firing—did not meet every element of due process needed to support a discharge he could then quit, claim constructive discharge and win because the employer had not satisfied the requirements of due process for discharge. That way it would be impossible for employers to notify employees that they are under investigation and that discharge is possible, without that procedure violating due process. Yet due process actually *requires* such notice.

*Conclusion*

Defendants have shown there is no genuinely disputed issue of material fact and that they are entitled to a judgment as a matter of law. This action is dismissed.