**Barbara M. RYAN and William O. Gillespie, Plaintiffs,**

v.

**ILLINOIS DEPARTMENT OF CHILDREN & FAMILY SERVICES (Injunctive Relief Only), Sue Suter, Thomas Villiger, Gary Veicht, Michael Horstman, Patrick Flynn, Michael P. Sakolsky, Ronald Moody, Rita G. Seggelke, John R. Henderson, Tom Putting, and John Bucari, all individually, Defendants.**

No. 92–3079.

United States District Court, C.D. Illinois, Springfield Division.

May 7, 1997.

Patricia C. Benassi, Charles E. Tucker, Jr., Peoria, IL, for plaintiffs.

Deborah L. Barnes, Terence J. Corrigan, Springfield, IL, for defendants.

## OPINION

RICHARD MILLS, District Judge:

The Plaintiffs waived the majority of their claims in this lawsuit by failing to avail themselves of their procedural due process rights, i.e. failing to appear at the pre-termination hearing and the civil service hearing.

The remaining claims are grounded solely on the First Amendment rights of speech and religion. At the close of Plaintiffs' evidence, it becomes clear that no reasonable jury could find in their favor and Defendants,

therefore, are entitled to judgment as a matter of law.

But first, the prolix facts of this case.

## I. FACTUAL BACKGROUND

William Gillespie was the Regional Administrator of the Springfield Region of the Illinois Department of Children and Family Services ("DCFS") from June 1981 until January 23, 1992, when he was terminated. Barbara Ryan had been employed by DCFS for 27 years and was the Assistant Regional Administrator when she retired on December 31, 1991.

Prior to their terminations, both Ryan and Gillespie had excellent work records and had no prior discipline in connection with their employment. They administered the Springfield Region jointly from 1984 until their termination. Not only did Plaintiffs work together, they also established Sand Dollar Publishing Co. in 1984 to publish Gillespie's works. Gillespie wrote poetry and wrote books dealing with the subject of reincarnation.

Ryan and Gillespie claim Defendants retaliated against them for a series of communications and other protected conduct. The Defendants, and their position at DCFS at the time of the termination, are as follows [1]:

1. *DCFS:* an agency and political subdivision of the State of Illinois established by state statute in order to provide social services to children and families, to operate children's institutions, and to provide other rehabilitative and residential services.

2. *Sue Suter:* Director of DCFS from approximately January 1991 until after the events in question.

3. *Thomas Villiger:* Deputy director for DCFS. He is now retired. Ryan and Gillespie were under his supervision.

4. *Garry Veicht:* Executive Deputy Director.

5. *Michael Horstman:* Executive Deputy Director.

6. *Patrick Flynn:* Child Protective Investigator.

7. *Michael Sakolsky:* Adoption Worker (caseworker).

8. *Ronald Moody:* Administrative Case Reviewer (caseworker)

9. *Rita Seggelke:* Field Office Supervisor and DCP (Child Protective Services) Investigator.

10. *John Henderson:* Labor Relations Administrator.

11. *Tom Putting:* Chief of Personnel.

12. *John Bucari:* Administrator of Management Services.

In September 1989, Ryan was removed from the Springfield Regional Office and placed on special assignment. Villiger requested she draft a Child Welfare Initiative to identify problems and solutions within DCFS. Ryan sought Gillespie's assistance. Upon completion, Villiger ordered them to remove all references and criticisms which they described in the Child Welfare Initiative which would have reflected adversely on his supervision. He then told them to remove their names claiming Gordon Johnson would be more receptive if their names did not appear on the document. Ryan and Gillespie provided an unedited copy to Jess McDonald, who was, at that time, the Governor's liaison to DCFS.

In December of 1989, a former DCFS client, Linda Gerhardt, claimed that she was improperly pressured into giving up her youngest child for adoption by Patrick Flynn. Flynn was under the supervision of Villiger, not Ryan or Gillespie. According to Plaintiffs, this led to a decision by Johnson, Villiger, and Horstman, in May 1990, to have the State Police investigate the handling of the Gerhardt case and the Springfield Region. Neither Ryan nor Gillespie were informed of the investigation.

The police interviewed Flynn who claimed that he had made the "baby deal" with Gerhardt at the direction of Ryan. Ryan claims that Flynn proposed the idea to her and she

---

**1.** Gordon Johnson, Acting Director of DCFS from 1983 until 1990, was voluntarily dismissed by the Plaintiffs as a defendant.

rejected it. Plaintiffs claim Flynn was well-known as a liar and had a reputation as a child molester. He had been investigated for allegations of child molestation. The investigation found merit to the claim but after an internal appeal the investigation was reversed. Plaintiffs also claim Flynn had close ties to Villiger and performed investigative work for Villiger.

A number of other "disgruntled employees" who were allegedly referred to the police investigators by Villiger and Flynn made statements concerning Ryan and Gillespie. These employees included Bucari, Moody, Sakolsky, and Seggelke.

In January 1990, Gillespie and two others selected Frank Melchiorri for the position of Springfield Regional Business Administrator. Melchiorri was a veteran, 65 years of age, and had been the Acting Business Manager for two years. Villiger refused to approve Melchiorri for the position until Gillespie stated that Melchiorri would file an age discrimination suit if he was not selected and that Gillespie would testify on his behalf. In July 1990, Gillespie chose Patti Lynch for the Adoption Coordinator's position. Again, Villiger refused to approve the appointment until Gillespie stated that Lynch would file a sex discrimination suit if she was not appointed and that Gillespie would testify on her behalf.

In June 1990, Jess McDonald replaced Johnson as Acting Director of DCFS. McDonald knew of the State Police investigation of the Springfield Region but was never apprised by anyone that Ryan and Gillespie were engaged in any wrongdoing.

On January 21, 1991, Sue Suter replaced Jess McDonald as Acting Director. During the months of December 1990 and January 1991, DCFS in general and the Springfield Region in particular were the subject of criticism in the local newspaper, *The State Journal–Register*. Gillespie and Ryan suspected the information was being fed to the press by Villiger and Flynn. They spoke to Horstman about their concerns but claim Horstman replied that nothing could be done.

In response to this negative publicity, Suter, on January 24, 1991, asked Villiger to brief her on the Springfield Region. Villiger stated that the Springfield Region was one of the most difficult to supervise from the Central Office. The memo was also critical of Ryan and Gillespie and recommended their removal. Horstman provided a memo to Suter on January 31, 1991, which summarized the State Police findings and recommended removing Plaintiffs from their position and transferring them to the Central Office, unless further information developed that would require discipline.

In February 1991, Gillespie and Ryan were informed that they were being removed from their positions as Regional Administrator and Assistant Regional Administrator, effective immediately. They were ordered to leave their offices within 24 hours. Villiger informed them that they were being placed on special assignment. Each was assigned to an old storage room in DCFS's Central Office with no support staff and no telephone. Both filed grievances, alleging their reassignment was punitive. Villiger, Henderson, Suter, and Veicht claimed the re-assignment was a special assignment due to their special skills. Ryan and Gillespie remained in this situation from February 1991 until December 31, 1991.

After their removal, special Internal DCFS Task Forces were established to investigate whether Ryan or Gillespie had engaged in any wrongdoing. According to Plaintiffs, no evidence of wrongdoing was discovered.

On June 11, 1991, Suter received a partial summary of the State Police investigation. The State's Attorney of Sangamon County declined to take any action based on the report.

On June 21, 1991, Veicht directed Henderson to review the State Police Report and draft charges against Ryan and Gillespie. Among the possible basis for discipline were 1) Gillespie's contact with Representative Curran; 2) Ryan's statements to the *Chicago Tribune*; 3) Gillespie's poetry; and 4) Ryan's religious beliefs. No independent investigation was conducted.

On July 10, 1991, Villiger gave Gillespie a good evaluation and recommended a 4.5 per-

cent raise. No mention of misconduct was raised in the evaluation.

In September 1991, Ryan and Gillespie attended a grievance hearing continuing to protest their re-assignment. The grievances were denied. On September 24, 1991, Villiger sent a memo to Tony Jenkins, Deputy Director of the Bureau of Field Operations, stating that he felt that Ryan and Gillespie would take their grievance to the fourth level, Central Management Services (CMS). Villiger was concerned that the persons to whom Ryan and Gillespie had been assigned were working on projects that the administration felt would not be appropriate for Ryan and Gillespie to work on. Thus, there was a major issue regarding future tasks for the future assignments. Villiger was concerned that unless the issue was resolved, CMS might rule against DCFS at the fourth level grievance.

A few days after the September grievance hearing, Ryan's husband, who had been ill, died. On her first day back, Ryan found that the desk and chair in her office had been removed. After several days, the items were returned. Plaintiff Ryan claims Villiger was responsible.

On October 2, 1991, the State Police closed their investigation. The closing document indicated that the case was administratively closed, the prosecutor declined the case, and adjudication was complete. There were no conclusions or findings of wrongdoing.

Mac Ryder, the Chief Legal Counsel for DCFS, asked the law firm of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd. to look at the charges that had been prepared, for form only. These were returned on December 20, 1991.

Suter made the decision to discharge Ryan and Gillespie based on the charges, the information received from her staff, and the information contained in the Illinois State Police report. The charges claimed that Plaintiffs had violated various DCFS rules. To summarize the charges:

Ryan:

1) failure to respond to an attorney's request for review; 2) failure to change service plan; 3) failure to require client to give DCFS the names of all people who visited the home so that CANTS[2] checks could be performed; 4) forcing agreement with client to terminate parental rights stating that in return, DCFS would discontinue monitoring another child; 5) pressured client into surrendering child; 6) offered client return of two children if parental rights were surrendered as to the other two children; 7 & 8) unauthorized use of special service fees; 9) misappropriation of DCFS funds and falsification of a contract; 10) failure to enter into a written contract with a counselor; 11 & 12) misappropriation of funds; 13) sale of poetry books during work hours; 14) expecting employees under her authority to attend autograph parties and making it mandatory for administrative staff to leave administrative meetings at 2:00 p.m. on work days, requested business manager meet her at a motel bar; 15) intimidation of staff; and 16) statement that "children remember being with God because it had not been nearly as long as they had seen God as it had for adults."

Gillespie:

1) failure to respond to an attorney's request for review; 2) failure to change service plan; 3) failure to require client to give DCFS the names of all people who visited the home so that CANTS checks could be performed; 4) permitted DCFS to force an agreement to terminate parental rights in exchange for discontinuation of monitoring; 5) pressured client into surrendering child; 6) permitted Ryan to offer client return of two children if parental rights were surrendered as to the other two children; 7 & 8) unauthorized use of special service fees; 9) permitted Ryan to misappropriate DCFS funds and falsify a contract; 10) failure to enter into a written contract with a counselor; 11 & 12) permitted misappropriation of funds; 13) sale of poetry books during work hours, expect-

2. CANTS reports are reports to the hotline. These reports can be made by anyone in the State of Illinois who suspects child abuse.

ed employees to attend autograph parties; 14) made it mandatory for administrative staff to leave administrative meetings at 2:00 p.m. on work days and had business manager meet him at motel bar; 15) intimidation of staff, abuse of authority, would sit at his desk and write poetry or do nothing but sit and look out the window; became angry when told there were no funds to re-carpet office; and 16) personal long-distance phone bills charged to DCFS.

On December 21, Ryan and Gillespie received an inter-office memorandum dated December 20, 1991, from John Henderson. It stated that their pre-termination hearing was set for December 30, 1991, that they would be given a copy of the charges at that time and that they were entitled to have representation present. Ryan and Gillespie retained attorney Patricia Benassi. On December 23, 1991, Benassi requested copies of the charges against Ryan and Gillespie, supporting documents, and a list of witnesses. She also asked that the pre-termination hearing be rescheduled for some time in the middle of January, as she could not attend on December 30. On December 27, 1991, Benassi received copies of the charges and approximately 300 pages of documents. She was told that the pre-termination hearing date would not be changed. Ryan and Gillespie did not attend the pre-termination hearing on December 30, 1991, claiming that they would rather not attend than attend without representation and without a meaningful opportunity to respond to the charges.

On December 31, 1991, Ryan retired from DCFS. On January 2, 1992, Benassi requested a number of documents to assist her in preparing Gillespie's response to the charges. On January 3, 1992, Henderson responded stating that all pertinent documents had been provided.

On January 7, 1992, Gillespie filed a written response to the charges. On January 16, 1992, Gillespie was suspended pending discharge by Suter. On January 23, 1992, he was terminated from his employment. Gillespie declined to proceed before the Illinois Civil Service Commission. Gillespie claimed that Suter had a Xerox contract with a member of the Commission and claimed the Commission was "political."

In early 1992, Ryan and Gillespie brought suit separately (their cases were later consolidated) against the Defendants claiming: 1) their discharge was sought in retaliation for the exercise of activity and speech protected under the First Amendment; 2) they were denied their procedural and substantive due process rights under the Fourteenth Amendment in that the charges against them were "trumped up"; 3) Defendants' actions violated the Illinois Whistleblower Protection Act; 4) Defendants' actions constituted the state tort of intentional infliction of emotional distress; 5) Defendants' actions constituted the state tort of negligent infliction of emotional distress; and 6) Defendants defamed them.[3]

Plaintiffs sought injunctive relief against DCFS and injunctive relief and damages against each individual defendant in his or her individual capacity. Plaintiffs sought: 1) $1,000,000 for compensatory damages and $1,000,000 for punitive damages, with interest, jointly and severally against each individual Defendant; 2) reasonable attorney fees and costs, with interest; 3) that Ryan be restored to her position of Assistant Regional Administrator and that Gillespie be restored to his position of Regional Administrator of the Springfield Region or a comparable position; 4) that any documents of an adverse or negative nature concerning Plaintiffs' activities be expunged from the state files and destroyed; 5) that Plaintiffs' work evaluations be processed immediately and allow wage increases and increased pension bene-

---

**3.** On December 28, 1995, Plaintiffs filed a motion for leave to amend their Complaints. Plaintiffs sought to add an equal protection claim. The motion was allowed, and Plaintiffs were given until January 11, 1996 to file their Amended Complaint. Plaintiffs did not do so. Nonetheless, both parties treated the equal protection claim as having been filed when addressing the motions for summary judgment. In fact, the Court, on October 25, 1996, in its original Order addressing the motions for summary judgment, treated the equal protection claim on its merits. On November 13, 1996, Defendants filed a motion to correct the record to strike the equal protection count. This motion was allowed.

fits be awarded retroactively with interest to each Plaintiff; 6) that an injunction be issued to prevent any of the individual Defendants or anyone under their supervision from further retaliating against Plaintiffs or any of its employees due to protected activities.

## II. SUMMARY JUDGMENT

On June 28, 1996, Defendants filed a motion for summary judgment on all counts. On July 8, 1996, Plaintiffs filed a motion for summary judgment on their due process and equal protection claims.

### A. *Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *see Ruiz–Rivera v. Moyer,* 70 F.3d 498, 500–01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist,* 833 F.2d 639 (7th Cir.1987).

### B. *Analysis*

#### 1. *Eleventh Amendment*

Defendants seek summary judgment on all claims against DCFS pursuant to the Elev-

enth Amendment. The parties do not dispute that DCFS is an agency and political subdivision of the State of Illinois established by state statute. Furthermore, the Seventh Circuit has recognized that DCFS is a state agency. *Darryl H. v. Coler,* 801 F.2d 893, 906 (7th Cir.1986) ("The DCFS is a state agency; it was established by state statute and is funded by the state.")

The Eleventh Amendment bars a suit against a state, in federal court, regardless of the relief sought, unless the state has waived its immunity or Congress has overridden it. *Brunken v. Lance,* 807 F.2d 1325, 1329 (7th Cir.1986), *citing Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985). This immunity extends to state or governmental entities that are considered "arms of the State." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Section 1983 does not abrogate the State's Eleventh Amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 340, 99 S.Ct. 1139, 1144–45, 59 L.Ed.2d 358 (1979). Nor has the state or DCFS waived its immunity. Therefore, Plaintiffs' suit against DCFS violates the Eleventh Amendment.

Furthermore, neither a state, nor a state department like DCFS, is a "person" within the meaning of § 1983. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 2308–09, 105 L.Ed.2d 45 (1989). Therefore, this Court lacks jurisdiction to adjudicate the Plaintiffs' § 1983 claim against DCFS. Defendant DCFS is hereby dismissed from the case.

#### 2. *Count I: Discharge in Retaliation for Exercise of First Amendment Rights*

To recover on a First Amendment retaliation claim, the plaintiff must prove: "1) the speech engaged in was constitutionally protected under the circumstances; and 2) that defendants retaliated against him because of that speech." *Gorman v. Robinson,* 977 F.2d 350, 354 (7th Cir.1992). After plaintiff meets the initial burden that the conduct

was constitutionally protected and that it was a substantial or motivating factor in the defendant's decision to discharge, the burden shifts to defendants to prove that the plaintiff would have been discharged even if the protected conduct had not occurred. *Conner v. Reinhard,* 847 F.2d 384, 393 (7th Cir.1988), *cert. denied* 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988).

 Only speech for which the Plaintiffs were disciplined is to be considered. *Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492, 1500 (7th Cir.1994). A plaintiff must produce "specific, nonconclusory allegations" reasonably linking her speech to employer discipline. *Id.* The plaintiff must point the court to specific record evidence demonstrating the required connection between employer discipline and the speech activity. *Id.* Plaintiffs claim they were retaliated against for the following instances of speech/conduct:

a. Communications with Federal Bureau of Investigation regarding actions of DCFS management.

b. Communications with elected and non-elected state officials, DCFS officials and management, and other persons concerning abuses of authority, mismanagement, malfeasance and other problems within DCFS.

c. Communications with Representative Michael Curran between 1987 and 1991 in which Gillespie provided Curran with information about DCFS, including its failure to provide adequate services for children, the problems caused by the administrative split between DCP and DPO and many other difficulties existing in the agency.

d. Drafting and communications about the Child Welfare Initiative which identified and provided solutions to problems faced by DCFS in 1989. This information was communicated to Jess McDonald, the Governor's Liaison, Defendant Villiger and Ron Davidson, a Deputy Director of DCFS.

e. Communications with Defendant Horstman and Defendant Villiger protesting the cessation of services of a much needed psychologist in the Springfield region.

f. Gillespie's Communications with Defendant Horstman regarding the impropriety of circumventing and violating the veteran's preference rules in connection with the hiring of an employee.

g. Gillespie's communications to Villiger that employees who were being discriminated against might file lawsuits and that Gillespie would be compelled to tell the truth if called as a witness.

h. Drafting, circulating and publishing poetry, and other writings, relating to DCFS and the children served by DCFS.

i. Religious beliefs and publications about reincarnation.

j. opposing and/or refusing to cooperate and support the placement of children with families who were politically powerful when it was not in the best interest of the children.

k. Ryan's communication with the press regarding actions of DCFS management.

l. Communication opposing the hiring and/or refusing to support the continued employment of unqualified employees who came from politically powerful families.

Plaintiffs claim the numerous acts of punishment by the Defendants were due to Plaintiffs exercising their rights under the First Amendment by speaking and protesting the action of officials and employees of DCFS as well as other public officials or persons acting in concert with the Defendants. Defendants filed a motion for summary judgment claiming that: 1) Plaintiffs have failed to link their discharge and other retaliatory actions to their protected first amendment conduct; 2) the described activities do not constitute protected speech; 3) the *Pickering* balancing test favors the defendants; and 4) Defendants are entitled to qualified immunity.

### a. *Link*

Plaintiffs, in their interrogatories, claim they suffered the following acts of retaliation at the hands of the following Defendants:

a. initiating and continuing the investigation (Villiger, Horstman, Flynn, Veicht, Su-

ter, Putting, Henderson, Seggelke, Bucari, Sakolsky);

b. using and encouraging disgruntled employees who had either been removed from their positions, criticized the Plaintiffs or subjected to disciplinary actions tools, to publicly and privately discredit and damage Plaintiffs' professional and personal reputation or to subject Plaintiffs to investigations without basis or foundation (Villiger, Horstman, Flynn, Veicht, Suter, Putting, Henderson, Seggelke, Bucari, Sakolsky);

c. failing to process job evaluations for a lengthy period of time (Villiger, Horstman, Suter, Veicht);

d. giving false information to the police or encouraging others to give false information to police to discredit Plaintiffs (Villiger, Horstman, Flynn, Bucari, Seggelke, Sakolsky, Suter, Veicht);

e. removing Plaintiffs from their positions, isolating them and giving them duties with little or no real responsibility (Horstman, Villiger, Suter, Veicht);

f. denying Plaintiffs and the Region access to needed equipment (Horstman, Villiger);

g. refusing to assign or authorize the hiring of personnel in accordance with designated personnel needs in order to punish Plaintiff Gillespie and make it more difficult for him and those under his supervision to perform their jobs (Horstman, Villiger);

h. discriminatorily subjecting Plaintiffs' region to internal and external audits and investigations while at the same time failing to take such actions in other areas of DCFS or other similarly situated personnel for purpose of discrediting Plaintiffs (Horstman, Villiger, Suter);

i. removing Plaintiff Ryan's desk and other equipment two days after her husband's funeral in order to harass and humiliate her and inflict further emotional distress on Plaintiff (Villiger);

j. prohibiting and/or discouraging Plaintiffs' co-workers from communicating with them and thereby isolating, punishing and discrediting them (Villiger);

k. bringing false, malicious, arbitrary, capricious, and/or discriminatory pre-termination charges which Defendants knew did not constitute improper conduct and Defendants knew Plaintiffs did not do. Plaintiff Ryan was served with these charges even though she was due to retire (Henderson, Putting, Veicht, Suter);

l. terminating Plaintiff Gillespie for reasons which were arbitrary, capricious, and discriminatory and/or pretextual and which Defendants knew to be so.

Defendants first claim that except for the discharge, none of the alleged acts constitute retaliation. "[T]he complained of action must be sufficiently adverse to present an actual or potential danger that the speech of employees will be chilled." *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 191 (7th Cir.1995). The law of this Circuit provides that the retaliation "need not be monstrous to be actionable under the First Amendment; it need merely create the potential for chilling employee speech on matters of public concern." *DeGuiseppe*, 68 F.3d at 192; *see also Walsh v. Ward*, 991 F.2d 1344, 1345 (7th Cir.1993) ("a campaign of petty harassment may achieve the same effect as an explicit punishment.") Thus, any of Defendants' alleged acts could constitute retaliation under the Seventh Circuit test if Plaintiffs can link the alleged acts to their protected speech and conduct.

Drawing all reasonable inferences in Plaintiffs' favor, this Court finds that Plaintiffs have failed to link most of their instances of speech to retaliatory action by the Defendants. The Plaintiffs have failed to point this Court to the required connections between employer discipline and protected speech in all but four instances. This Court is not required to "scour the voluminous record" for them. *See Wright*, 40 F.3d at 1501. And while Plaintiffs have claimed that Defendants were not happy with Plaintiffs' communications, that is not sufficient. As stated in *Wright*,

[w]e do not doubt that the defendants may have been displeased by some or all of these activities, but, as we noted in *O'Connor [v. Chicago Transit Authority]*, 985 F.2d [1362] at 1369 [(7th Cir.1993)], a

plaintiff may not sustain her burden "simply by showing that the elimination of the protected activity may have been welcomed by the defendants," nor can we typically draw strong conclusions from the mere fact that protected speech may have preceded an adverse employment decision. *Wright*, 40 F.3d 1492 (7th Cir.1994).

Plaintiffs have provided an adequate link between employer discipline and four instances of speech: 1) Ryan's communication with the *Chicago Tribune;* 2) Gillespie's communication with Representative Curran; 3) Gillespie's poetry; and 4) Ryan and Gillespie's belief in reincarnation.

Those four instances of speech were initially used by Henderson (at the request of Veicht) to develop charges of misconduct against Gillespie and Ryan. Although the final charges did not include Ryan's communication with the *Chicago Tribune* or Gillespie's communications with Representative Curran, the Court agrees with Plaintiffs that the fact that they were included in the initial draft of charges provides a sufficient link between those activities and the actions leading to termination. Putting is also linked through his supervision of Henderson's drafting and his representation of the charges.

The charges against Ryan and Gillespie did include Gillespie's poetry and Ryan's statement regarding her belief in reincarnation as a basis for terminating them. Suter utilized these two charges as a basis for terminating Plaintiffs.

■■■ Plaintiffs try to reach the other Defendants by stating that all Defendants were involved in a conspiracy. There are two elements of a § 1983 conspiracy: 1) "an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and 2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir.1988), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988).

Plaintiffs claim there is ample evidence of a conspiracy. Plaintiffs claim Flynn, Villiger and Horstman initiated the state police inves-

tigation; Villiger and Horstman recommended to Suter that Plaintiffs be removed from their jobs; Veicht ordered Henderson to draft charges; Villiger, Henderson, Suter, Veicht and all another persons involved in the termination knew that no wrongdoing or misconduct had been uncovered; Henderson, Horstman, Villiger, Veicht, Putting and Suter all participated in the decision to discharge; and Villiger met with Bucari, Sakolsky, Flynn and Moody in an attempt to solicit negative information about Plaintiffs.[4]

The Court finds that only Plaintiffs' evidence concerning Henderson, Horstman, Villiger, Veicht, Putting and Suter's participation in the decision to discharge is supported by sufficient evidence to infer a conspiracy and defeat Defendants' motion for summary judgment as to those Defendants. Plaintiffs' allegations that some Defendants met with each other or that one Defendant directed others to talk to the State Police does not make a conspiracy. As to all other Defendants, Plaintiffs have failed to provide evidence of an express or implied agreement to deprive Plaintiffs of their constitutional rights.

■■■ Defendants argue that only the Defendants who actually participated in the decision to discharge the Plaintiffs can be held responsible. That is not the law. Liability against a person in his individual capacity under § 1983 is predicated upon personal responsibility and he cannot be held liable unless he personally caused or participated in an alleged constitutional deprivation. *Schultz v. Baumgart*, 738 F.2d 231, 238 (7th Cir.1984). Direct participation, however, is not necessary. "Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights." *Conner v. Reinhard*, 847 F.2d 384, 396 (7th Cir. 1988), *cert. denied*, 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988).

---

4. Plaintiffs admit Seggelke had no contact with the other Defendants.

In *Conner,* one of the defendants (Zopler), in response to statements plaintiff made at a Board of Ethics meeting, went to plaintiff's supervisor and demanded plaintiff be fired, and if she were not fired, Zopler would have plaintiff's position eliminated at budget time. Defendant Reinhard subsequently fired plaintiff. *Id.* The court denied the defendants' summary judgment motion because a reasonable jury could conclude that plaintiff was fired due to the pressure by Zopler.

Plaintiffs have not, however, presented any evidence that any persons, other than those Plaintiffs have already linked to the retaliation, set in motion a series of events that the Defendants knew or should have known would cause others to deprive Plaintiffs of their constitutional rights. Plaintiffs have provided no evidence that Flynn, whose accusation initiated the investigation of the Springfield Region, made this allegation in response to any protected speech/conduct by the Plaintiffs. Nor have Plaintiffs provided evidence that Flynn had reason to know that the other Defendants would deprive Plaintiffs of their constitutional rights. Similarly, the Defendants who made statements to the State Police, statements that were later used to discharge Plaintiffs, had no reason to know that their statements, which were made in response to an investigation, would lead to a constitutional deprivation of Plaintiffs.

Plaintiffs have failed to link the remaining Defendants to any communication and retaliation. The only retaliatory action linked to any alleged protected speech is the termination. This Court will not scour the record for the Plaintiffs in search of sufficient links. Therefore, at this juncture, the Court is left with the charge of termination [5] for the above mentioned speech/activity by the following Defendants: Villiger, Suter, Henderson, Horstman, Veicht and Putting.

### b. *Protected Speech Analysis and Pickering Balancing*

Having found a link between the four instances of speech/conduct and the termination, the Court must now determine whether the instances of speech/conduct are constitutionally protected.

### i. Public Concern

The first step in determining whether the Plaintiffs engaged in protected speech is to determine whether the speech involved a matter of public concern. *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). This is a legal question to be determined by the court. *Connick v. Myers,* 461 U.S. at 148, 103 S.Ct. at 1690–91 (1983).

According to *Connick v. Myers,* to decide whether a statement is a matter of public concern, the court must examine the "content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147–148, 103 S.Ct. at 1690. Content is the most important factor. *Yoggerst v. Hedges,* 739 F.2d 293, 296 (7th Cir.1984). The "inappropriateness or controversial character of a statement is irrelevant" in determining whether the speech involves a matter of public concern. *Rankin v. McPherson,* 483 U.S. 378, 387, 107 S.Ct. 2891, 2898–99, 97 L.Ed.2d 315 (1987), *reh'g denied,* 483 U.S. 1056, 108 S.Ct. 31, 97 L.Ed.2d 819 (1987). "[W]hen a public employee speaks not as a citizen upon matters only of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to view the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690.

The Court must address each instance of speech to determine if it involves a matter of public concern.

### A. Communications with Representative Curran

Between 1987 and 1991, Gillespie had a number of conversations with Representative Curran. Curran originally initiated the conversations because he would receive

---

5. Plaintiff Ryan claims she was constructively discharged and has created a genuine issue of material fact as to whether such claim is true. The Court will refer to the retaliation against both Plaintiffs as "termination."

complaints about DCFS and Gillespie was easily accessible to him. They discussed 1) problems administering the Region with the DCP/DCO split[6]; 2) failure of the agency to use its money properly; 3) improper practices in the Central Office; 4) Patrick Flynn, who had been an "indicated child abuser"[7]; 5) that Gillespie's ability to administer the Springfield Region was being undermined by Villiger; and 6) problems with accountability.

This Court finds that the discussions with Curran did involve matters of public concern. Gillespie tried to bring to light possible wrongdoing. And except for the discussion about Gillespie's ability to administer the Region, it does not appear that Gillespie was raising private concerns or that it was an extension of Gillespie's private disputes with other agency officials. Gillespie sought to provide information to Curran, at Curran's request, to ultimately help DCFS.

### B. Ryan's Communications with the Press

 Ryan was interviewed four times in September 1986 by Bruce Dold of the Chicago Tribune. She was quoted as stating:

> Barbara Ryan, an Assistant Regional Administrator in Springfield and a twenty-two year veteran of the department said that case workers have placed children in foster homes knowing that they had too many problems for an untrained foster family to handle. "We assumed that children had to fail (in foster care) before they could go to institutions," Ryan said. "It was a philosophy that had developed over the agency. We tried to stop that." The Court finds that this also touches on a matter of public concern, as the entire newspaper article was about this and other related problems within DCFS. Ryan sought to bring to light a problem within the agency.

### ii. Balancing Test

 Having determined that Plaintiffs' speech involved a matter of public

concern, the next step is to "balance the interests of the [employee], as a citizen, in commenting upon matters of public concern and the State's interest, as an employer, in promoting the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. Factors to consider in deciding the extent to which an employer may legitimately take adverse employment action include: 1) the effect of the Plaintiffs' conduct on discipline and harmony among co-workers; 2) whether the employment relationship is one in which personal loyalty and confidence are necessary; 3) whether the speech impeded Plaintiffs' ability to competently perform their daily duties; 4) the time, place or manner or the speech; 5) the context in which the underlying dispute arose; 6) whether the matter was one on which debate was vital to informed decisionmaking; and 7) whether the speaker should be regarded as a member of the general public. *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1502 (7th Cir.1994). First Amendment protection of government employees extends to private expression (such as between the employee and a supervisor) but the *Pickering* balance may involve different considerations. *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979).

Defendants claim that Plaintiffs were high-level administrators and had significant responsibilities for management and control for the Region's delivery services and for implementing agency policy. Defendants also claim that Defendants were entitled to rely on the loyalty of Plaintiffs regarding their policy decisions. Finally, Defendants claim that Plaintiffs' action disrupted the functioning of the office and undermined the authority of Plaintiffs' supervisors.

The Court will examine each of Plaintiffs' claims of protected speech and determine whether Defendants' interest in promoting the efficiency of the public services it per-

---

6. DCP is the Child Protective Service; DCO is the Child Welfare Service. The two agency services were bifurcated.

7. Meaning the investigation "found merit" to the claim. The investigation was overturned on appeal.

forms outweighs the Plaintiffs' interest in expression.

### A. Gillespie's Communications with Representative Curran

■ Although a close question, Gillespie's interest in this communication outweighs Defendants' interest. Gillespie sought to cure problems in DCFS and provide information to a person who could arguably make some changes. He was a high-level worker who had knowledge about problems within DCFS. There is no indication that these discussions undermined the authority or effectiveness of Gillespie's supervisors. Gillespie was asked about problems within DCFS and merely responded over a period of time. The manner in which he communicated information also weighs in favor of Gillespie's interest. Finally, there is no indication that these communications disrupted the working environment or affected Plaintiff's performance of his duties.

### B. Ryan's Communications with the Press

■ Ryan spoke to the *Chicago Tribune* in an article about problems within DCFS. She stated that there had been problems but that DCFS was trying to change that. The Court finds that this statement in no way affects the discipline and harmony among the co-workers, does not violate confidentiality, does not discourage a loyal and confidential relationship between Plaintiff and any Defendant, does not affect the performance of daily duties, nor was the manner in which it was expressed improper.

#### c. *Protected Conduct*

##### i. Religious Beliefs

Both Plaintiffs believe in reincarnation. Gillespie wrote several books that dealt with the subject of reincarnation. One of the charges for seeking to discharge Ryan was that she stated to Judy Altevogt of the Illinois Foster Care Association that alcoholics are closer to God, that alcoholic tremors are really their reaction to seeing God and that small children remember being with God because it had not been nearly as long as [sic]

they had seen God as it had for adults. There was also mention in Horstman's memo to Suter that Ryan, who believed in reincarnation, was alleged to have taken a foster child home because they had been friends in a previous life. Horstman stated that taking foster children home for overnight stays is a violation of Department policy. This was not, however, one of the charges against Ryan.

■ A public employee may not be discharged for his religious belief. *Robinson v. Price,* 615 F.2d 1097, 1099 (5th Cir.1980), citing *Abood v. Detroit Bd. of Ed.,* 431 U.S. 209, 233–34, 97 S.Ct. 1782, 1798–99, 52 L.Ed.2d 261 (1977); *School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 217–218, 83 S.Ct. 1560, 1568–1569, 10 L.Ed.2d 844 (1963). Because it is not clear for what reasons the Plaintiffs were discharged, summary judgment is not proper on this issue.

##### ii. Gillespie's poetry

■ Gillespie wrote poetry and other books. Gillespie's writing and poetry was used in official training programs for DCFS staff. The poetry writing is protected by the First Amendment. *Eberhardt v. O'Malley,* 17 F.3d 1023, 1026 (7th Cir.1994).

#### d. *Substantial and Motivating Factor*

■ Plaintiffs must demonstrate that their speech was a "substantial" or "motivating" factor in the Defendants' decision to discharge the Plaintiffs. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Plaintiff must show that *"had it not been for the violation,* the injury of which he complains would not have occurred." *Rakovich v. Wade,* 850 F.2d 1180, 1189–90 (7th Cir.1988), citing *Button v. Harden,* 814 F.2d 382, 383 (7th Cir.1987) (emphasis in original).

Genuine issues of material fact exist as to whether Plaintiffs' constitutionally protected expression was a substantial or motivating factor in Defendants' adverse actions. Plaintiffs presented evidence of statements by some of the Defendants who allegedly made the decision to discharge Plaintiffs indicating that they did not believe there was any basis

for the charges. The evidence could lead a jury to conclude that Plaintiffs' protected First Amendment activity was a motivating factor in their termination. If Plaintiffs succeed in showing that their constitutionally protected expression was a motivating factor, then the burden shifts to the Defendant to show it would have discharged the Plaintiffs anyway. As this Court has determined that genuine issues of material fact exist as to whether Plaintiffs' protected speech was the motivating factor in their discharge, Defendants Suter, Villiger, Horstman, Henderson, Putting and Veicht are not entitled to summary judgment on this issue.

### e. *Qualified Immunity*

■ Defendants claim that even if the speech is protected and even if the speech survives the balancing test, the Defendants are entitled to qualified immunity. Qualified immunity is a question of law to be determined by the court. *Rakovich v. Wade*, 850 F.2d 1180 at 1202. The correct standard for determining whether a defendant is entitled to qualified immunity was set out in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982): "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738.

■ In *Wade v. Hegner*, the Seventh Circuit provided the two part test the district court must use when state of mind is at issue, as it is in this case: "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? ... Intent is relevant to (1) but not to (2)." 804 F.2d 67, 70 (7th Cir.1986). In order to answer (1), the court must determine whether the plaintiff has factually supported the allegations as to the state of mind element. *Polenz v. Parrott*, 883 F.2d 551, 554 (7th Cir.1989).

Here, the alleged conduct, as supported by Plaintiffs' evidence, would set out a constitutional violation, if proven. Therefore, this Court must decide whether the constitutional standards were clearly established at the time in question.

■ The Court must properly characterize the "right" in question. The identification of clearly established law is not to be applied in broad terms. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). In order for a right to be "clearly established," the right must be established in a "particularized" sense:

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039 (internal citations omitted). The "clearly established law" need not be identical to the present case. Yet, there must be similar cases, decided before the defendant's action, in order to find that a constitutional right is clearly established. *Abel v. Miller*, 824 F.2d 1522, 1533 (7th Cir.1987). The test for immunity is: " 'whether the law was clear in relation to the specific facts confronting the public official when he acted.' " *Rakovich*, 850 F.2d at 1209, (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.1987)).

■ In this case, the question is whether, in 1991, the law was clearly established that a reasonable supervisor [8] could have concluded that: 1) communications between regional administrators and an elected official about problems within DCFS would be entitled to constitutional protection; 2) that a regional administrator's disclosures to the press about problems within DCFS were entitled to constitutional protection; 3) that a regional administrator's writing of poetry was entitled to constitutional protection; 4) that a region-

---

**8.** This appears to be the easiest characterization for all the Defendants.

al administrator's religious beliefs were entitled to constitutional protection. Because of the balancing test in deciding whether speech is entitled to protection, the analysis must also include whether, under clearly established law, the statements were so disruptive that the Defendants were justified in retaliating. *Conner v. Reinhard,* 847 F.2d at 389.

### i. Communication with Representative Curran

The Court finds that it was clearly established in 1991 that a supervisor could not terminate an employee for communications with an elected official about problems within the organization and that such communications were of public concern. *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (letter criticizing school board budgetary policies was published involved a matter of public concern and employer's interests did not outweigh teacher's first amendment rights; therefore, discharge was illegal); *Marshall v. Allen,* 984 F.2d 787, 796 (7th Cir.1993)("Cases decided by this court and the Supreme Court ... clearly establish that speech of this type, which protests conditions in a public agency and does not solely promote the plaintiff's own interests, addresses a matter of public concern and enjoys First Amendment protection.") (citing *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691; *Knapp v. Whitaker,* 757 F.2d 827, 840–42 (7th Cir.1985), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985); *Gorman v. Robinson,* 977 F.2d 350 (7th Cir. 1992) (holding that communications with the FBI were protected under the First Amendment because prior to 1986 the law was clear that an employer may not retaliate against an employee for expressing his views about matters of public concern.))

### ii. Ryan's Communication with the Press

In *Sundstrom v. Village of Arlington Heights,* 826 F.Supp. 1143 (N.D.Ill.1993), the court held that an employer was not entitled to qualified immunity for denial of a promotion of an employee who made statements to the press about irregularities with department procedures because the law was clearly established in 1991. The Court relied on *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in which the Supreme Court held that a letter to the newspaper by a school teacher which criticized the school board was a matter of public concern and the teacher's interest outweighed that of the school.

Therefore, this Court finds that it was clearly established in 1991 that an employee's communications with the press concerning perceived problems in the agency is protected conduct and that the interest of the employee outweighs the interest of the employer, thereby rendering termination of employee for that speech a constitutional violation.

### iii. Gillespie's Poetry and Plaintiffs' Religious Beliefs

In *Eberhardt v. O'Malley,* the court claimed that the absence of a reported case for an elementary violation of the First Amendment demonstrates "nothing more than widespread compliance with well-recognized constitutional principles." 17 F.3d 1023, 1028 (7th Cir.1994). In *Eberhardt,* the court held that punishment for writing a novel, without a valid reason for such punishment, was a violation of the First Amendment. Similarly, if Gillespie was fired for writing poetry, and not for writing poetry on State time, then Defendants would not be entitled to qualified immunity. Additionally, termination of Plaintiffs for their religious beliefs would be such an "elementary violation" of the First Amendment that Defendants should not be entitled to qualified immunity. See *Eberhardt,* 17 F.3d at 1028.

Therefore, this Court finds that Defendants are not entitled to qualified immunity on this claim.

### 3. *Count II—Violation of Due Process*

■ "The Due Process Clause 'is not a guarantee against incorrect or ill-advised personnel decisions.'" *Collins v. City of Harker Heights,* 503 U.S. 115, 129, 112 S.Ct. 1061, 1070, 117 L.Ed.2d 261 (1992), (quoting *Bishop v. Wood,* 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976)). Moreover, "[t]he mere deprivation by state action of a constitutionally protected interest is not

itself unconstitutional. What is unconstitutional is the deprivation of such an interest without due process of law." *Wallace v. Tilley*, 41 F.3d 296, 299 (7th Cir.1994) (emphasis in the original). *See also Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).

■ Analyzing a due process claim is a two-step inquiry: whether there was a deprivation for protected interest and, if so, whether the procedures attendant upon the deprivation were constitutionally sufficient. *Vukadinovich v. Board of Sch. Trustees of Michigan*, 978 F.2d 403, 410 (7th Cir.1992), *cert. denied*, 510 U.S. 844, 114 S.Ct. 133, 126 L.Ed.2d 97 (1993).

Both parties filed for summary judgment on this claim. Defendants claim Plaintiffs were afforded all the process due. Plaintiffs claim they were entitled to an opportunity to be heard at a meaningful time and in a meaningful manner.

Although addressed in the statement of the facts, this Court will again outline the circumstances of this case pertaining to this issue. Plaintiffs received notice of their pre-termination hearing (scheduled for December 30, 1991) on December 21, 1991. Their attorney requested a copy of the charges, numerous documents, and that the hearing be rescheduled. Defendants provided a copy of the charges and 300 pages of documents, but refused to reschedule the hearing. Plaintiffs refused to attend the hearing and Ryan retired on December 31, 1991. Gillespie then responded to the charges. After his termination, Gillespie was entitled to a hearing before the Civil Service Commission. He refused to request the hearing because he felt the Commission was "political" and that one of the Commissioners had a Xerox contract with Suter.

### a. *Protected interest*

Plaintiffs claim they were deprived of a property interest because both were certified employees under the Personnel Code of the State of Illinois and could be terminated only for just cause as defined therein. Defendants do not contest this.

Defendants do, however, question which Defendants Plaintiffs seek to hold liable for the alleged deprivation of due process. In their Motion for Summary Judgment, Plaintiffs make it clear this claim is against Henderson, Putting, Veicht, and Suter. Therefore, the other Defendants are entitled to summary judgment on this claim as they had no part in the procedures, or lack thereof, alleged to have denied Plaintiffs their due process rights.

### b. *Deprivation*

Due process analysis requires that there be state action sufficient to invoke the constitutional guarantee, a liberty or property interest to which the plaintiff has a claim of entitlement, and a determination of the amount of process which is due to protect that interest. *Holbrook v. Pitt*, 643 F.2d 1261, 1276–77 (7th Cir.1981).

Generally, due process requires that before a government body deprives a person of a constitutionally protected interest in life, liberty, or property, it must conduct some type of hearing accompanied by notice and an opportunity to be heard. *Zinermon v. Burch*, 494 U.S. at 127, 110 S.Ct. at 984. It has been held that notice of reasons for discharge and a meaningful opportunity to respond, coupled with a post-termination hearing, is sufficient. *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1265 (7th Cir.1985), citing *Schultz v. Baumgart*, 738 F.2d 231, 235 (7th Cir.1984).

■ Notwithstanding Plaintiffs' arguments (lack of notice, failure to receive documents), Plaintiffs failed to attend the pre-termination hearing. There is support for Defendants' claim that failure to attend a pre-termination hearing waives the right to claim lack of due process. *See Cliff v. Board of Sch. Com'rs of Indianapolis*, 42 F.3d 403, 413 (7th Cir.1994) (Plaintiff waived her right to a pre-termination hearing by not attending); *Flynn v. Sandahl*, 58 F.3d 283, 289 (7th Cir.1995) ("employee cannot claim lack of due process when his employer offered him such a pre-termination hearing and he refused to attend."); *Suckle v. Madison Gen. Hosp.*, 499 F.2d 1364, 1367 (7th Cir.1974) (employee "cannot sue in federal court to secure a right

which he declined when it was voluntarily offered to him.").

The Court is mindful, however, that if Plaintiffs could show that they failed to attend because the hearing would not have been meaningful, then they would have a claim. *See Cliff,* 42 F.3d at 414 ("Absent contrary evidence, we must assume that the offered hearing would comport with due process." Plaintiff provided no evidence to support her assertion that the decision to terminate her had already been made thereby rendering her hearing meaningless.) But in the instant case, Plaintiffs have not presented evidence that the decision was already made; Plaintiffs have only stated that "there is undisputed evidence to show that the decision to terminate Gillespie and Ryan was made long before charges were brought against them." This "undisputed evidence" is that Della Nelson, the attorney who was retained to review the form of the charges, stated that it was her understanding that the Defendants wanted Plaintiffs out of the Region.

The evidence Plaintiffs do present, and which Defendants do not dispute, is that no independent investigation was conducted. Defendants relied on the State Police investigation. Further, Plaintiffs argue that Defendants did not have any evidence to back up the charges and that all the Defendants were aware that there was no evidence to back up the charges and that the reasons were a "sham." The Court is hard pressed to find that there was "no opportunity for a meaningful hearing" when Plaintiffs did not even go to the hearing. How can the Court find lack of due process when Plaintiffs failed to take advantage of such process? At the hearing, Plaintiffs could have objected to the evidence used to bring the charges and pointed out evidence to exonerate them. If, after that, Plaintiffs had come to this Court and provided evidence that the hearing was a sham, then Plaintiffs may have had a cause of action.

Plaintiffs rely on *Ciechon v. City of Chicago,* 686 F.2d 511 (7th Cir.1982), in which the Court found that defendants had violated plaintiff's due process rights by misuse of disciplinary procedures and by allowing themselves to be manipulated by other parties. Because of the irregular administrative procedures used, the case was slanted. Therefore, the hearing was a "sham" and the plaintiff was entitled to relief. *Id.* at 521. Although Plaintiffs point out that several of their allegations against Defendants in this case are similar to those in *Ciechon,* Plaintiffs fail to notice that in *Ciechon,* the plaintiff attended the hearing provided. Therefore, the court could determine that her due process rights were violated because the hearing was not meaningful due to the irregular procedures used. The Court cannot make that determination here.

### 4. Count III—Illinois Whistleblower Protection Act

The Illinois Whistleblower Protection Act, 5 ILCS 395, applies only to employees of constitutional officers. The Act does not apply to the Defendants here. *See Wright,* 40 F.3d at 1509. Therefore, Defendants are entitled to summary judgment on this Count.

### 5. State Law Claims

Plaintiffs brought state law claims against the Defendants for intentional infliction of emotional distress, negligent infliction of emotional distress, and defamation. Because a number of Defendants have been granted summary judgment on the federal claims, the Court exercises its power to dismiss the pendant state law claims against those Defendants. 28 U.S.C. § 1367(c)(3). Therefore, the state law claims survive only as to Defendants Suter, Henderson, Veicht, Putting, Horstman and Villiger.

Defendants make a number of arguments in their Motion for Summary Judgment. They allege that the claims are barred by sovereign immunity, that Plaintiffs have no evidence to support their claims, and that Defendants are entitled to public official or absolute immunity.

#### a. Sovereign Immunity

█ Defendants claim they are entitled to judgment because the claim is barred by the principles of Illinois Sovereign immunity. "[S]tate rules of immunity are binding in

federal court with respect to state causes of action." *Benning v. Bd. of Regents of Regency Universities,* 928 F.2d 775, 779 (7th Cir.1991). Under Illinois law, the state's Court of Claims has "exclusive jurisdiction over tort suits against the state." *Id.* See 705 ILCS 505/8(d) (1993).

 Courts are not bound by the formal designations of the parties in the pleadings. *Currie v. Lao,* 148 Ill.2d 151, 170 Ill.Dec. 297, 300, 592 N.E.2d 977, 980 (1992). The Court must analyze the issues and the nature of relief sought to determine whether an action against a State official or employee is actually one against the State. *Id.* An action is "against the state" when judgment for the plaintiff operates to control the actions of the State or subject it to liability. *Id.* If the claim is actually one against the State, it must be brought in the Illinois Court of Claims. If, however, a "State employee ... breaches a duty he owes regardless of his State employment [he] is no more entitled to immunity than is a private individual who breaches that same duty." *Id.*

 Plaintiffs claim Defendants committed the torts of negligent and intentional infliction of emotional distress and defamation. The duty to not commit these torts against persons exists regardless of Defendants' state employment and therefore the claims are not in actuality claims against the State. This is not a situation where Defendants breached a duty imposed on them solely by virtue of their official positions. *Id.* Therefore, the Defendants are not entitled to sovereign immunity.

b. *Emotional Distress Claims—Lack of Evidence*

Defendants next argue that there is no evidence to support a claim of negligent and intentional infliction of emotional distress. Defendants first claim that Plaintiffs did not clearly indicate the actions giving rise to the claim. Defendants surmise that the move to the Central Office, the failure to give Plaintiffs meaningful work, and the entire process of removing them pending the State Police investigation are the basis for their tort claims. Plaintiffs fail to address this in their response, relying solely on their claim that a

factual question exists for the jury to determine whether the executive official was acting outside his authority when taking the wrongful action.

i. Intentional Infliction of Emotional Distress

 A claim for intentional infliction of emotional distress requires proof: 1) of extreme and outrageous conduct by the defendant; 2) that the actor intended or knew there was a high probability that the conduct would inflict severe emotional distress; and 3) that the conduct did in fact cause severe emotional distress. *Lopacich v. Falk,* 5 F.3d 210, 212 (7th Cir.1993), citing *McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806 (1988). The conduct must be egregious. "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress or even that this conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found [only when the conduct] is so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency." *Public Fin. Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 654, 360 N.E.2d 765, 767 (1976), citing RESTATEMENT (SECOND) OF TORTS § 46, cmt. d (1965). The emotional distress must be severe. Fright, horror, grief, shame, humiliation are alone not actionable. *Public Fin. Corp.,* 4 Ill.Dec. at 654, 360 N.E.2d at 767. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Id.*

 The Court finds that, as a matter of law, Plaintiffs have not sustained severe emotional distress as a result of any conduct by any of the Plaintiffs. Plaintiffs have not provided any allegations of severe emotional distress, other than the statement in their complaint that they suffered "severe emotional distress." Plaintiffs have not presented any evidence that the emotional trauma has affected the manner in which they live their lives. Nor have Plaintiffs alleged any

effect upon their emotional well-being as a result of the Defendants' actions. *See Herrera v. Chisox Corp.*, No. 93–C4279, 1995 WL 599065, \*11 (N.D.Ill. October 6, 1995).

Therefore, Defendants are entitled to summary judgment on this claim.

### ii. Negligent Infliction of Emotional Distress

■ Negligent infliction of emotional distress provides a remedy for a bystander in the zone of danger who, because of the defendant's negligence, has a reasonable fear for his own safety. *Rickey v. Chicago Transit Auth.*, 98 Ill.2d 546, 75 Ill.Dec. 211, 215, 457 N.E.2d 1, 5 (1983). The plaintiff must suffer physical injury or illness as a result of the emotional distress caused by defendant's negligence. *Id.* (citations omitted).

Plaintiffs have failed to provide any facts that would support a cause of action for negligent infliction of emotional distress. Therefore, Defendants are entitled to summary judgment on Count VI.

### c. *Defamation—Public Official or Absolute Immunity*

Defendants first note that Plaintiffs have failed to make clear the defamatory statements upon which they are asserting this cause of action. Defendants rely on Plaintiffs' depositions which indicate the statements upon which the cause of action rests. Plaintiffs fail to be more specific or correct Defendants in their memorandum in opposition to the motion for summary judgment. Therefore, the Court will rely on Plaintiffs' depositions for the claimed defamatory statements.

■ Plaintiffs claim Suter made defamatory statements to the *Chicago Tribune* in a letter to the editor. Her letter was in response to an editorial in the paper about DCFS. She sought to clarify the date the activities occurred, which were before she was Director, and explained that she removed the two regional administrators (the Plaintiffs) from their positions and had asked the State Police to investigate their conduct.

Plaintiffs base their defamation claim against the other Defendants for the following actions: 1) Villiger's memo to Suter explaining the problems with the Springfield Region and specifically stating problems with the Plaintiffs; 2) Henderson drafted the charges against them, despite the fact that he knew there was no merit to any of the charges; 3) Veicht allowed the State Police investigation to continue when he knew the Plaintiffs did nothing wrong; 4) Putting was a party to the drafting of the charges; 5) Horstman brought charges when he knew the Plaintiffs had done nothing wrong.

■ The Defendants claim, however, that regardless of what Plaintiffs claim constitutes defamation, the high level officials (Suter, Veicht, Horstman, Villiger, Henderson, and Putting) are entitled to absolute privileged communication immunity, as DCFS is part of the executive branch of state government. *See* 20 ILCS 505/1 et seq. "Absolute privilege is a defense in a defamation action against government officials." *Geick v. Kay*, 236 Ill.App.3d 868, 177 Ill.Dec. 340, 346, 603 N.E.2d 121, 127 (2nd Dist.1992), *appeal denied* 148 Ill.2d 641, 183 Ill.Dec. 18, 610 N.E.2d 1262 (1993), *cert. denied* 509 U.S. 924, 113 S.Ct. 3040, 125 L.Ed.2d 726 (1993), citing *Morton v. Hartigan*, 145 Ill.App.3d 417, 99 Ill.Dec. 424, 495 N.E.2d 1159 (1st Dist.1986). This defense recognizes the strong policy that government officials should be free to exercise their duties without fear of potential civil liability. *Blair v. Walker*, 64 Ill.2d 1, 6, 349 N.E.2d 385 (1976). The defense provides that officials of the executive branch of the Federal, State or local governments cannot be held liable for statements made within the scope of their official duties. *Geick*, 177 Ill.Dec. at 346, 603 N.E.2d at 127, citing *Dolatowski v. Life Printing & Publ'g Co. Inc.*, 197 Ill.App.3d 23, 143 Ill.Dec. 757, 554 N.E.2d 692 (1990), *appeal denied* 133 Ill.2d 554, 149 Ill.Dec. 319, 561 N.E.2d 689 (1990). The statement must be reasonably related to one's duties. *Morton v. Hartigan*, 145 Ill.App.3d 417, 99 Ill.Dec. 424, 430, 495 N.E.2d 1159, 1165 (1st Dist.1986). Illinois courts have applied this doctrine even to lower level officials. *See Id.* 99 Ill.Dec. at 429, 495 N.E.2d at 1164 (and cases cited therein).

The Court finds that Plaintiffs have failed to provide the alleged defamatory statements made by Defendant Veicht. Plaintiffs simply claim he allowed the State police investigation to continue.

As for the other five Defendants, the Court finds they are entitled to absolute immunity. Each person's alleged defamatory statements were made pursuant to their duties. Therefore, all Defendants are entitled to summary judgment on Count VI.

#### 6. *Relief Sought*

■■■ Defendants claim Plaintiffs are not entitled to injunctive relief because they lack standing, as articulated in *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). A § 1983 plaintiff is only entitled to injunctive relief if he has a personal stake in the outcome of the litigation. *Stewart v. McGinnis,* 5 F.3d 1031, 1037 (7th Cir.1993) (citations omitted), *cert. denied* 510 U.S. 1121, 114 S.Ct. 1075, 127 L.Ed.2d 393 (1994). The plaintiff must show that he "has sustained or is immediately in danger of sustaining some direct injury" as a result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." *Lyons,* 461 U.S. at 101–02, 103 S.Ct. at 1664–65. Evidence of past wrongs alone are insufficient. *Id.* at 102, 103 S.Ct. at 1665.

■■■ Plaintiffs seek an injunction "to prevent any of the individual Defendants or anyone under their supervision from further retaliating against Plaintiff or any of its employees due to protected activities." Plaintiffs are no longer employed at DCFS and have failed to show they are immediately in danger of suffering some direct injury. Furthermore, Plaintiffs have no standing to request injunctive relief on behalf of all employees as this is not a class action. *See Trotter v. Klincar,* 566 F.Supp. 1059, 1062–63 (N.D.Ill.1983), *aff'd* 748 F.2d 1177 (7th Cir. 1984). Therefore, Plaintiffs do not have standing to request injunctive relief.

Therefore, Plaintiffs' Motion for Summary Judgment is DENIED. Defendants' Motion for Summary Judgment is ALLOWED in part. The only surviving claim in this case is Count I against Defendants Suter, Villager, Henderson, Horstman, Veicht, and Putting.

### III. JUDGMENT AS A MATTER OF LAW

Immediately before trial, Defendants filed a renewed motion for summary judgment, which the Court treated as a motion in limine. This motion raised the defense of qualified immunity based on the fact that at the time Plaintiffs were terminated, the law in the area of speech-related discharge of policymakers was unsettled. Prior to this time, the "policymaker" issue was not raised. The motion was denied but Defendants were given leave to refile.

The trial in this case began on April 15, 1997. At the close of Plaintiffs' evidence, Defendants filed a motion for judgment as a matter of law claiming: 1) Defendants were entitled to qualified immunity as no case put Defendants on notice that discharging two policymakers for speaking on issues of Department policy with which they disagreed violated Plaintiffs' civil rights; and 2)Plaintiffs failed to show that their protected conduct and/or beliefs were a substantial motivating factor in their discharge.

#### A. *Legal Standard*

Federal Rule of Civil Procedure 50(a)(1) clearly establishes the standard by which a district court should decide a motion for judgment as a matter of law:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

*See Mayer v. Gary Partners and Co., Ltd.,* 29 F.3d 330, 335 (7th Cir.1994). Thus, the standard for deciding motions for judgment as a matter of law mirrors the standard for deciding a motion for summary judgment. *Shields Enterprises, Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992).

"In either case, the district court must enter judgment if, under the governing law, a reasonable fact-finder could not find for the nonmoving party." *Id.; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If a reasonable jury could find for the nonmoving party, judgment as a matter of law is inappropriate. *Shields Enterprises,* 975 F.2d at 1294.

### B. *Analysis*

#### 1. *Qualified Immunity*

Defendants argue that they are entitled to qualified immunity as the case law involving the area of speech related discharge of policy-makers was unsettled in 1991.

 As set forth previously above, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738. Plaintiffs have the burden of pointing out a closely analogous case that establishes that they have the right to be free from the specific conduct alleged to violate the general constitutional right at issue. *Rice v. Burks,* 999 F.2d 1172, 1174 (7th Cir.1993). Once a defendant raises the issue of qualified immunity, "courts may logically approach a summary judgment motion using a two-step analysis ..." *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994). The court must ask: "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question?" *Id.,* citing *Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991).

 Assuming the alleged conduct does set out a constitutional violation, the Court finds that the constitutional standards were not clearly established at the time in question.

Defendants rely on the Seventh Circuit case of *Warzon v. Drew,* 60 F.3d 1234 (7th Cir.1995), to demonstrate that the area of speech-related discharge of policymakers was unsettled at least as of 1995. In *Warzon,* the court pointed out that there were two lines of cases. One line of cases developed the principle that, on the one hand, public employment cannot be conditioned on a "basis that infringes the employees' constitutionally protected interest in freedom of expression," while on the other hand, the "government qua employer must have greater power to regulate the speech of its employees than to regulate the speech of the citizen." 60 F.3d at 1238, citing *Connick v. Myers,* 461 U.S. 138, 142 and 157, 103 S.Ct. 1684, 1687 and 1695, 75 L.Ed.2d 708 (1983). To harmonize the two principles, courts apply the *Pickering* balancing test. *Warzon,* 60 F.3d at 1238.

 A related series of cases involve patronage dismissals. *Id.* Policy-makers are subject to patronage dismissal. *Warzon,* 60 F.3d at 1238, citing *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 74, 110 S.Ct. 2729, 2736–37, 111 L.Ed.2d 52 (1990). While the patronage cases originally provided only that a policy-maker could be fired on *political grounds,* the *Warzon* court held that the distinction between running against a superior in an election and speaking out against the superior makes no difference. *Id.* at 1238–39. "The concern driving the policymaker exception 'is with the effects on the operations of government of forcing a public official to hire, or retain, in a confidential or policymaking job, persons who are not his political friends and may be his political enemies.'" 60 F.3d at 1239, quoting *Wilbur,* 3 F.3d at 217–218. "Such a concern is as acute when a person openly disagrees with an official's policy stance in a certain area." *Warzon,* 60 F.3d at 1239. The court noted that "[w]e may be wise to leave the decision of what type of speech by policy makers warrants dismissal to the elected official." *Id.* at 1239, n. 1. *See also Wilbur v. Mahan,* 3 F.3d 214, 219 (7th Cir.1993) (disagreeing with the Eleventh Circuit's opinion that the *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) patronage cases and *Pickering* speech cases cannot be combined); *Marshall v. Porter County Plan Commission,* 32 F.3d 1215 (7th Cir.1994) (patronage cases are a subset of cases concerning dis-

**1516**

charge in retaliation for the exercise of First Amendment rights).

Plaintiffs point to the 1996 United States Supreme Court decision which clears up the confusion regarding patronage cases and speech cases. In *O'Hare Truck Serv. Inc. v. City of Northlake*, —— U.S. ——, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996), the Court noted that an inquiry different than the patronage inquiry is required when the government employer takes adverse action on an employee because of the employee's right of free speech. *Id.* at ——, 116 S.Ct. at 2357. But Plaintiffs fail to point to a closely analogous case in 1991 which shows that the law was clearly established that policy makers could not be terminated for speaking out against agency policy.

▮▮▮ Thus, the only question that remains is whether Plaintiffs were policy makers. The test for whether a person is a policy maker is "whether the position held by the individual authorized, either directly or indirectly, meaningful input into government decision-making on issues where there is room for principled disagreement on goals or their implementation." *Warzon*, 60 F.3d at 1239, quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981). The Court must "examine the positions' inherent powers, rather than those actually exercised by any one occupant." *Selch v. Letts*, 5 F.3d 1040, 1044 (7th Cir.1993). Simply because plaintiff's "recommendations did not ultimately carry the day has no bearing; the relevant inquiry is input, not absolute control." *Warzon*, 60 F.3d at 1240. Plaintiffs deny they are policymakers.

The Plaintiffs' job descriptions were not admitted into evidence at the trial. Instead, Defendants rely on Plaintiffs' job evaluations to demonstrate that Plaintiffs were indeed policymakers. Plaintiffs argue that despite what the evaluations state, they were merely mid-level managers whose job it was to carry out policies developed by the Central Office administrators. Moreover, Plaintiffs argue that they did not perform any of the duties of their position during the last year of their employment because Defendants had removed them from their positions and gave them little to do.

Defendants point out that the performance evaluations of Plaintiffs demonstrate Plaintiffs were policymakers. The evaluations, signed by Plaintiffs, list the objectives of their job and an evaluation of these objectives. The description of Plaintiffs' job description and objectives, coupled with the fact that Plaintiffs signed these evaluations thereby admitting the contents therein, demonstrate Plaintiffs were policymakers.

▮▮▮ For example, Ryan's evaluation for the period between December 1, 1989 through November 30, 1990 states that Ryan: 1) "plans, develops and administers the Regional integration of direct service and support service functions into a comprehensive program of social service delivery;" 2) "[p]articipates in all Regional planning activities; formulates and directs the implementation of policies and procedures for program services; interprets and enforces Federal and State statutes and Department policies and procedures; develops and recommends Regional policies and procedures;" 3) "[a]ssists with the preparation, justification and administration of the regional budgets, consistent with federal, state and department goals."

▮▮▮ Gillespie's evaluations similarly support Defendants' claim that Plaintiffs were policymakers. For example, Gillespie's evaluation for the period between June 1, 1989 and June 1, 1990, states that Gillespie was: 1) "responsible for the preparation and management of the Regional budget;" 2) "responsible for planning, implementation and monitoring of all Regional contracts;" and 3) was required "to organize and coordinate DCFS Divisions compliance issues at Chaddock."

As Defendants point out, the job responsibilities of Plaintiffs are analogous to the job responsibilities of the plaintiff in *Warzon*. In *Warzon*, the court held that because plaintiff's position was a policy-making position, plaintiff could be terminated for advocating positions in conflict with her employer's stated policies. 60 F.3d at 1239. The court determined plaintiff was a policymaker by relying on a memorandum written by plaintiff describing her duties and responsibilities. *Id.* The court found that her positions gave

her "meaningful input into the government decisionmaking." *Id.* at 1240.

Likewise, this Court finds that based on the evaluations, signed by Plaintiffs, that describe the Plaintiffs' job responsibilities, there is no legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiffs on this issue.

Consequently, the Court finds that Plaintiffs were policymakers and that no case put Defendants on notice that terminating two policymakers for speaking out against agency policy would violate the policy makers constitutional rights. Therefore, as to Gillespie's claim that he was terminated for his communications with Representative Curran and Ryan's claim that she was constructively discharged for her communications with the *Chicago Tribune*, Defendants are entitled to qualified immunity.

The Court cannot, however, find that Defendants are entitled to qualified immunity on Plaintiffs' claim that Gillespie was discharged for poetry writing and that Ryan and Gillespie were terminated for their belief in reincarnation. The absence of a case on point holding that policy makers cannot be terminated for poetry writing or a belief in reincarnation does not entitle Defendants to qualified immunity. It should be obvious that termination of Plaintiffs for the religious beliefs or for poetry writing would be an "elementary violation" of the First Amendment. See *Eberhardt*, 17 F.3d at 1028.

### 2. *Substantial Motivating Factor*

Even though Defendants are not entitled to qualified immunity as to Plaintiffs' claims that they were discharged for their religious beliefs or that Gillespie was terminated for his poetry writing, Defendants are entitled to judgment as a matter of law on those claims because Plaintiffs' evidence is too meager to support a reasonable inference that Plaintiffs were terminated for their protected conduct. The Court also finds that Defendants would be entitled to judgment as a matter of law on the communications claims because Plaintiffs' evidence is insufficient. Defendants argue that, at most, Plaintiffs

have presented evidence of only a personal animus toward Plaintiffs.

An employee discharged for exercising First Amendment rights must prove that his or her protected conduct or belief was a substantial motivating factor in the discharge. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The burden then shifts to the defendants to prove, by a preponderance of the evidence, that plaintiff would have been discharged even in the absence of the protected conduct. *Id.*

Plaintiffs argue that they presented sufficient circumstantial evidence to support their claim that Defendants retaliated against them for their constitutionally protected conduct. The Court disagrees.

At most, the Plaintiffs have demonstrated that there existed personal animus on the part of the Defendants toward Plaintiffs but have not demonstrated any retaliatory animus. *See Miller v. State of Illinois*, 681 F.Supp. 538 (N.D.Ill.1988) (describing in Title VII case the difference between personal animus and a pretext for discrimination). Examining all of Plaintiffs' evidence in the light most favorable to them, the Court finds that a reasonable jury could not find for Plaintiffs. Plaintiffs' evidence does not support a reasonable inference that Defendants sought to terminate Plaintiffs for the content of their speech.

For example, in regard to Gillespie's communications with Curran, Gillespie could only demonstrate that one person, Villiger, knew of the content of the speech and that his only comment to Curran was that Curran should not listen to Gillespie. Suter knew of the communications but not the content and while Curran testified that Suter did not seem "happy" that Gillespie spoke to Curran, no other evidence of animus was demonstrated. Ryan's communication with the *Chicago Tribune* occurred five years before the terminations. Henderson testified that he included it in the draft for charges only because he included every complaint that had been made about Plaintiffs to the State Police in the initial draft of charges. The charge was later removed after discussing the matter with Greg Seifert. Plaintiffs have

**1518**

not provided any evidence that this reason is pretextual or unworthy of belief.

Plaintiffs argue that Gillespie was fired for writing poetry, not for writing poetry on state time. Yet, at trial, Gillespie admitted writing much of his poetry on state time, which is exactly what the charge stated. Gillespie has presented no evidence linking a retaliatory animus on the part of any Defendant to the content of any poem.

And finally, Plaintiffs claim they were terminated in retaliation for their religious beliefs. No reference to Gillespie's belief in reincarnation was made in the charges against Gillespie. Gillespie has failed to link any retaliatory animus toward his religious belief to any Defendant.

One of the charges against Ryan was that she made the statement to the president of the Illinois Foster Parents' Association that children are closer to God because it has not been as long since they have seen God. At trial, Ryan, while denying she made the remark, testified that if she had made such a remark, it would have been unprofessional. The only other reference to Ryan's religious beliefs relates to a memorandum written by Horstman to Suter stating that Ryan took a foster child home. As Defendants point out, the memo does not demonstrate any animus because of Ryan's beliefs. It merely placed in context the reason why Horstman believed Ryan had allegedly taken the foster child home. Even Ryan admitted that if she had taken a foster child home after the regulation barring such action had taken effect, the conduct would have warranted disciplinary action.

Thus, the Court finds that Plaintiffs have not presented sufficient evidence such that a reasonable jury could find for the Plaintiffs. Based on the evidence, at most, Plaintiffs have demonstrated a *personal* animus by the Defendants. Yet, this is distinctly different than an unconstitutional retaliatory animus, one which would support an inference of retaliation for Plaintiffs' exercise of their First Amendment rights.

### IV. CONCLUSION

Therefore, the Court finds Defendants are entitled to qualified immunity on Gillespie's claim that he was terminated in violation of the First Amendment for his communications with Representative Curran and Ryan's claim that she was terminated in violation of the First Amendment for her communication with the *Chicago Tribune*. The Court also finds Defendants are entitled to judgment as a matter of law on all claims because Plaintiffs' evidence is not such that a reasonable jury could find in their favor.